AMENDED DECISION AND ORDER
 

 SIRAGUSA, District Judge.
 

 INTRODUCTION
 

 This is an action brought pursuant to 42 U.S.C. § 405(g) to review the final determination of the Commissioner of Social Security (“Commissioner”) denying plaintiffs application for Supplemental Security Income (“SSI”) benefits. Now before the Court is plaintiffs motion for judgment on the pleadings (# 9) filed on August 4, 2003, and defendant’s cross-motion for judgment on the pleadings (# 6) filed on August 5, 2003. For the reasons stated below, the Commissioner’s decision is reversed and the matter is remanded for a new hearing pursuant to the fourth sentence of 42 U.S.C. § 405(g).
 

 PROCEDURAL BACKGROUND
 

 Plaintiff filed his current
 
 [1]
 
 application for SSI benefits on March 27, 2001, stating “that he became disabled on January 1, 1994 due to a constellation of complaints.” Record at 17.
 
 [2]
 
 More specifically, plaintiff
 
 *CDLIX
 
 claims to be disabled due to a variety of ailments to his right hand, foot, back, right arm and shoulders and right knee cap, arthritis, a head injury, trouble reading and writing, learning disability, bone spurs in both feet, not being mobile, and being in constant pain. Record at 129. The application was denied on November 29, 2001. Record at 63, 81-84. Plaintiff then requested a hearing
 
 [3]
 
 before an Administrative Law Judge (“ALJ”), and a hearing was held on April 29, 2002. Record at 16. Plaintiff appeared at the hearing, with a lawyer, and testified. On May 17, 2002, the ALJ issued his decision finding that plaintiff was not entitled to SSI benefits. On or about June 24, 2002, plaintiff filed an appeal with the Appeals Council. Record at 10. On September 18, 2002, the Appeals Council denied plaintiffs request for review. Record at 5-6. The ALJ’s decision thus became the final decision of the Secretary.
 

 Plaintiff commenced this action pursuant to 42 U.S.C. §§ 405(g) and 1383(c)(3)
 
 [4]
 
 on November 7, 2002. On August 4, 2003, he filed his motion for judgment on the pleadings in which he contends that the ALJ’s decision is erroneous and must be reversed because the ALJ’s decision: (1) failed to properly evaluate plaintiffs claim under the Listing of Impairments 12.05C; (2) is not supported by substantial evidence pertaining to plaintiffs residual functional capacity; (3) improperly evaluates plaintiffs credibility; (4) improperly evaluates plaintiffs claim under the Medical-Vocational guidelines; and (5) incorrectly evaluated the vocational expert’s testimony. On August 5, 2003, defendant filed her cross-motion for judgment on the pleadings pursuant to Federal Rule of Civil Procedure 12(c), asserting that the ALJ’s determination is correct and supported by substantial evidence. The Court heard oral argument on these motions on November 20, 2003. The Court has thoroughly considered the parties’ submissions and the entire record in reaching its determination.
 

 STANDARDS OF LAW
 

 The applicable statute states, in relevant part, that “[t]he findings of the Commissioner of Social security as to any fact, if supported by substantial evidence, shall be conclusive.” 42 U.S.C. § 405(g). The issue to be determined by this Court is whether the Commissioner’s conclusions “are supported by substantial evidence in the record as a whole or are based on an erroneous legal standard.”
 
 Cruz v. Sullivan,
 
 912 F.2d 8, 11 (2d Cir.1990);
 
 accord Green-Younger v. Barnhart,
 
 335 F.3d 99, 105 (2d Cir.2003). “Substantial evidence is more than a mere scintilla. It means such relevant evidence as a reasonable mind might accept as adequate to support a conclusion.”
 
 Consolidated Edison Co. v. NLRB,
 
 305 U.S. 197, 229, 59 S.Ct. 206, 83 L.Ed. 126 (1938);
 
 accord Richardson v. Perales,
 
 402 U.S. 389, 401, 91 S.Ct. 1420, 28 L.Ed.2d 842 (1971);
 
 see also Cruz v. Sullivan,
 
 912 F.2d 8, 11 (2d Cir.1990).
 

 
 *CDLX
 
 For purposes of the Social Security Act, a disability is the “inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to last for a continuous period of not less than 12 months.” 42 U.S.C. § 423(d)(1)(A);
 
 Schaal v. Apfel,
 
 134 F.3d 496, 501 (2d Cir.1998).
 

 The SSA [Social Security Administration] has promulgated administrative regulations for determining when a claimant meets this definition. First, the SSA considers whether the claimant is currently engaged in substantial gainful employment. If not, then the SSA considers whether the claimant has a “severe impairment” that significantly limits the “ability to do basic work activities”. If the claimant does suffer such an impairment, then the SSA determines whether this impairment is one of those listed in Appendix 1 of the regulations. If the claimant’s impairment is one of those listed, the SSA will presume the claimant to be disabled. If the impairment is not so listed, then the SSA must determine whether the claimant possesses the “residual functional capacity” to perform his or his past relevant work. Finally, if the claimant is unable to perform his or his past relevant work, then the burden shifts to the SSA to prove that the claimant is capable of performing “any other work.”
 

 Schaal,
 
 134 F.3d at 501 (citations omitted). At step five of the five-step analysis outlined above, the defendant may carry his burden by resorting to the Medical Vocational Guidelines or “grids” found at 20 C.F.R. Pt. 404, Subpart P, Appendix 2.
 
 Pratts v. Chater,
 
 94 F.3d 34, 38-39 (2d Cir.1996) (citation omitted);
 
 see also,
 
 SSR 83-10 (noting that in the grids, “the only impairment-caused limitations considered in each rule are exertional limitations.”) However, if a claimant has nonexertional impairments which “significantly limit the range of work permitted by his exertional limitations,” then defendant cannot rely upon the grids, and instead “must introduce the testimony of a vocational expert (or other similar evidence) that jobs exist in the economy which claimant can obtain or perform.”
 
 Id.
 
 at 39. “Exertional limitations” are those which affect an applicant’s ability to meet the strength demands of jobs, such as sitting, standing, walking, lifting, carrying, pushing, and pulling. “Non-exertional limitations” are those which affect an applicant’s ability to meet job demands other than strength demands, such as anxiety, depression, inability to concentrate, inability to understand, inability to remember, inability to tolerate dust or fumes, as well as manipulative or postural limitations, such as the inability to reach, handle, stoop, climb, crawl, or crouch. 20 C.F.R. § 416.969a. The Commissioner’s regulations also provide, in pertinent part, “[w]hen the limitations and restrictions imposed by your impairments) and related symptoms, such as pain, affect your ability to meet both the strength [exertional] and demands of jobs other than the strength demands [nonexer-tional], we consider that you have a combination of exertional and nonexertional limitations or restrictions.... [W]e will not directly apply the rules in appendix 2 [the grids] unless there is a rule that directs a conclusion that you are disabled based upon your strength limitations; otherwise the rule provides a framework to guide our decision.” 20 C.F.R. § 416.927(d).
 

 WORK HISTORY
 

 The facts of this case are set forth at length in the parties’ submissions and in the Decision of the ALJ, and, unless otherwise indicated below, are not in dispute. For the purposes of the present motions, it is sufficient to note the following facts. At
 
 *CDLXI
 
 the time of the hearing, plaintiff was 51 years old and had completed the twelfth grade in special education. Record at 212. After leaving high school, plaintiff received training in “heating and electricity” with the Job Corps in 1971 in Indiana. Record at 135, 248. He reported to the Social Security Administration that he held positions as a general laborer from 1974 to 1980, a shop and road repair mechanic and installer at a bottling company in 1981, a handyman at various hotels, apartments and a farm from 1982 to 1987, and a kitchen helper in various restaurants and food service cafeterias from 1978 to 1987. Record at 142. Further, a vocational expert, Peter Manzi (“Manzi”), who testified at the hearing, indicated that plaintiff worked as a janitor from 1982 to 1989. Record at 40.
 

 Plaintiff reported in a form entitled, “Disability Report Adult,” and dated April 24, 2001, that he stopped working on October 15, 1989, and stated the reasons were, “pain and affliction — related to other problems [for] which treatment was sought.” Record at 129.
 

 MEDICAL HISTORY
 

 Plaintiff submitted all of his relevant medical records to the ALJ. However, “Mather than recount every detail of [plaintiffs medical record, the Court] instead will briefly summarize their contents.”
 
 Pratts v. Chater,
 
 94 F.3d at 36.
 

 On June 15, 2000, Megan Terwilliger, M.D., recorded plaintiffs prior medical history to include the following: hypertension; hyperlipidemia; obesity; degenerative joint disease; alcohol abuse; past history of cocaine abuse; history of chronic pain; open reduction and internal fixation of a radial fracture to his right arm; ac-hilles bursitis; history of rectal bleeding; a question of congestive heart failure; and calcaneal spurs. Record at 234. Dr. Ter-williger also noted that plaintiff had difficulty reading the HIV form. Record at 236. She ordered a number of tests, reviewed plaintiffs medical records, and concluded that: (1) an April 2000 x-ray showed resolution of congestive heart failure; (2) plaintiff had posterior and plantar calcaneal spurs and mild osteoarthritic change to his left knee; (3) a stress test (no date listed) showed a normal submaxi-mal exercise echocardiogram with ejection fraction of 55% to 60%; (4) a resting EKG that showed ST T abnormalities suggesting LVH or lateral ischemia; (5) a very mild, if any, disability in regard to his left knee injury of 1981; (6) no significant abnormalities in plaintiffs right hand relating to a reported injury in 1991; and (7) “[n]o other significant injuries contributing to disability .... ” Record at 235. Dr. Terwilliger wrote in his report that plaintiff stated
 
 [5]
 
 “he was [sic] felt he could be doing some work, but have restrictions for his left knee,
 
 ie.:
 
 avoid squatting, kneeling or repetitive stair climbing and not climbing a ladder.”
 
 Id.
 

 On December 7, 2000, plaintiff was seen by Stephen Lyons, Physician’s Assistant. Plaintiff reported pain and swelling of his right arm at the site of a previous fracture. Record at 233. An x-ray was taken, and plaintiffs arm wrapped in an Ace bandage. The x-ray revealed internal fixation consisting of a plate and six screws. The reviewing doctor, Alka Kumar, M.D., concluded from the x-ray that nothing was out of place. Record at 157.
 

 
 *CDLXII
 
 On January 25, 2001, plaintiff was seen by James A. Slobard, M.D., following an emergency room visit for a complaint of bloody stools. Record at 231. Dr. Slo-bard diagnosed hemorrhoids, but was also concerned about plaintiffs complaints of chest pain. He noted that plaintiff, weighed 254 pounds, had a blood pressure of 130/80, that his lungs were clear, and he had a regular heart rate without murmurs, gallops, or rubs. Record at 231. His conclusion was, “Obesity. Clearly this patient needs to lose some weight. Once we have clarified his cardiac status I will encourage him to exercise more.” Record at 231. Dr. Slobard ordered a dipyridamole thallium stress test, noting that plaintiffs chest pain “is somewhat atypical.”
 
 Id.
 
 Dr. Slo-bard prescribed nitroglycerin tablets, and also ordered a colonoscopy. He planned to see plaintiff again in a month.
 
 Id.
 
 The colonoscopy was essentially normal. Record at 160.
 

 On February 28, 2001, plaintiff was again seen by Dr. Slobard. Record at 228. He continued his complaints of chest pain. Dr. Slobard observed, “[h]e is an obese gentleman. Weight is 261 lb. BP is 148/88.” Record at 228. He again noted the regular rate and rhythm of plaintiffs heart and noted also that his extremities were without edema, cyanosis, or clubbing.
 
 Id.
 
 Dr. Slobard reviewed the results of the dipyridamole thallium stress test and concluded that it showed, “an old infarction of the inferior and posterior wall with dilated left ventricle, with preserved global left ventricular systolic function of 51 %, although the test was not completed fully because he developed some SOB
 
 [6]
 
 .” Dr. Slobard concluded that plaintiff should see a cardiologist, possibly for a catheterization, but that he was “[c]ertainly ... not a candidate for any diet medications, although he needs to lose weight clearly with this kind of condition.” Record at 228.
 

 On March 9, 2001, plaintiff saw Krishna M. Rao, M.D., a cardiologist. Record at 183. He complained about shortness of breath after climbing one set of stairs. Dr. Rao stated in a letter to Dr. Slobard that plaintiff reported, “he is doing well with no further episodes of chest pain. He has offered no complaints.” Record at 183. Dr. Rao also concluded, from his study of the various tests, that, “[i]n all likelihood, Mr. Johnson has hypertensive heart disease.... From a cardiac standpoint of view, we need to focus on coronary risk factor modification. This would include control of hypertension, lipid abnormalities and obesity.” Record at 183. In another letter to Dr. Slobard, Dr. Rao noted that plaintiffs symptoms were, “significant for obesity, degenerative joint disease [and] probable sleep apnea.” Record at 186. With regard to plaintiffs abnormal chest pains, Dr. Rao concluded that these were non-cardiac chest pains and speculated that it was possible that plaintiff, “developed fixed wall motion abnormalities involving the posterior wall and inferior wall due to cocaine-induced coronary artery spasm or thrombosis.” Record at 186. Dr. Rao asked plaintiff to discontinue use of illicit drugs, to lose about 3(M:0 pounds, and stated he would see plaintiff for follow-up in four to six weeks. Record at 186.
 

 While he was being followed by Dr. Rao, on May 4, 2001, plaintiff returned to Dr. Slobard complaining about muscle pain in his lower extremities. Record at 225. Plaintiff reported he no longer experienced chest pain. Dr. Slobard advised plaintiff to obtain proper shoes to help his back and knees feel better, to continue to try and
 
 *CDLXIII
 
 lose weight and moderately exercise when he could. Record at 225.
 

 On September 20, 2001, plaintiff saw Dr. Slobard for a follow-up visit. The doctor noted in his report that plaintiff said his muscle pain had decreased significantly since he had been taking a statin drug for several months and occasional pain was relieved by Tylenol #3. Record at 224. He also noted that plaintiff experienced shortness of breath only when he walked long distances (no description of “long” was given), but that his other medical problems included hypertension, obesity and COPD. Record at 224. He further noted that plaintiff had “some diffuse muscle tenderness all over his entire body.” Id. Dr. Slobard wrote that plaintiff continued to suffer from persistent myalgias (muscle pain), which was improving. He also indicated that since plaintiff would be seeing Rheumatology within the next two weeks, he would not prescribe prednisone. Dr. Slobard also reported that plaintiff was continuing to gain weight and they discussed the importance of diet and exercise; that he would try some ibuprofen to control plaintiffs arthralgias (joint aches); that plaintiffs blood pressure was not being well controlled; and that he had read the June 2001 notes from cardiology and could not hear the murmur that was found by the echocardiogram. Record at 224.
 

 Plaintiff was seen by Allen Anandarajah, M.D., on April 5, 2002, at the Immunology and Rheumatology Clinic at Strong Memorial Hospital. Dr. Anandarajah recorded plaintiffs complaints of aches and pains in all of his muscles, and conducted a physical examination. He noted, among other things, that plaintiffs weight was 266 pounds, his blood pressure was 140/80, that his muscle strength and tone were normal in both upper and lower limbs, but that he did have eighteen tender trigger points. Record at 300. Dr. Anandarajah assessed that, “[t]he findings of the tender trigger points and the history of insomnia do suggest a diagnosis of fibromyalgia.” Id. He wrote that he had discussed this with plaintiff, and suggested that plaintiff would benefit from fibromyalgia classes, physical therapy, and sleep studies to rule out the possibility of sleep apnea. Dr. Anandarajah did not intend to follow-up with plaintiff unless any new symptoms developed. Record at 300.
 

 Dr. Slobard completed a Medical Examination for Employability Assessment, Disability Screening, and Alcoholism/drug Addiction Determination form on June 21, 2001.
 
 [7]
 
 On the form he indicated that plaintiff was “moderately limited” in walking, standing, sitting, lifting, carrying, pushing, pulling, bending, seeing, hearing, speaking, using his hands and climbing. He also indicated on this form that there was no evidence of limitations with regard to understanding and . remembering instructions, carrying out instructions, maintaining attention and concentration, making simple decisions, interacting appropriately with others, maintaining socially appropriate behavior without exhibiting behavior extremes, maintaining basic standards of personal hygiene and grooming, and appearing able to function in a work setting at a consistent pace. Record at 209. Additionally, Dr. Slobard also noted on the form that plaintiff was not limited as a result of an addiction within the past twelve months. Id. at 210. In the section asking him to list any limitations on plaintiffs work activities, Dr. Slo-bard did not write anything. Id. at 210.
 

 
 *CDLXIV
 
 On August 28, 2001, George Alexis Siro-tenko, D.O., conducted a consultative medical examination of plaintiff. Record at 215. Among other things, he noted that plaintiff used a cane for support and balance, had smoked one pack of cigarettes per day for the past twenty years, was able to carry a small bag of groceries and a gallon of milk, was divorced, and lived alone, caring for himself. He noted that plaintiff was five feet, five inches tall and weighed 258 pounds and that his blood pressure was 112/58. He noted that plaintiffs “general appearance is that of a man who utilizes a cane and has a mildly an-talgic gait.” Record at 213. Dr. Sirotenko observed that plaintiff was able to walk around the room, but “he intermittently touched furniture for support. He needed assistance getting on and off the examination table.” Dr. Sirotenko also observed that plaintiffs shoulder abduction was 100 degrees, internal rotation 20 degrees and external rotation 40 degrees, all “subjectively limited with pain.” Record at 214. Dr. Sirotenko determined that plaintiff did not present any evidence of rheumatoid arthritis, but had subjective limitations in ranges of motion in his elbows, hips, knees and ankles. He concluded that plaintiff would benefit from “activities of a mild degree of physical exertion,” that he should avoid using his hands “in an overhead fashion,” avoid “repetitive kneeling, squatting or bending,” and avoid “walking up stairs, inclines or ladders.” Record at 215. He also wrote that plaintiff, “will require the use of a cane for support and balance on an as needed basis.”
 
 Id.
 
 Dr. Sirontenko concluded that plaintiff would be able to push, pull and lift objects up to 20 pounds on an intermittent basis, provided those objects were on a table at waist height, that he should avoid lifting any object over his head, avoid kneeling, squatting or bending and avoid stairs, inclines and ladders. He also stated that plaintiff, “should be given frequent opportunities to change positions throughout the day, alternating between sitting, standing and walking every 15 to 20 minutes.” Record at 215.
 

 With respect to non-exertional limitations, in 1965 when he was fifteen and one-half years old, plaintiff was seen by psychologist, J.L. Barnett. Dr. Barnett noted that plaintiff was a “fairly tall, slender, well dressed 15 year old. He made a very good adjustment to the test situation in that he was very cooperative, attended well, and put forth a good effort.” Record at 295. The test results, from the Wesh-sler-Bellevue Intelligence Scale Form I, administered by Dr. Barnett, included a verbal scale of 72 I.Q. and a letter rating for age of D-. Dr. Barnett concluded that, “[bjorderline dull ability is suggested by these results,” and that plaintiffs academic level was within the second grade level. Record at 295. He recommended placement in an occupational education class.
 
 Id.
 
 In a yearly progress form dated June 1967, his teacher at Franklin High School, Mrs. Borisoff, stated, “[d]o not feel [plaintiff] is working up to his full potential.” Record at 296. Subsequently on June 24, 1967, at age 17, plaintiff withdrew from school. At that time, he was reading, at best, at a third grade level. Record at 288, 296. In a Social Security Administration Disability Report, dated April 24, 2001, an interviewer noted that plaintiff, “needed help with reading some words on SSI application,” and “Case Worker completed the 3368 for Claimant.” Record at 140.
 

 The Record also contains a report dated April 22, 2002 from Frank D. Carson, C.S.W., Primary Therapist at Unity Health System in Rochester, New York. Mr. Carson reported that he had been involved with plaintiff for individual, cognitive behavior psychotherapy since August
 
 *CDLXV
 
 2001. Record at 302. He noted that plaintiff was in pain constantly and in his opinion, Mr. Carson believed plaintiff suffered from Dysthymic Disorder, DSM (Diagnostic and Statistical Manual of Mental Disorders) § 3004. The condition involves a chronically depressed mood that occurs most of the day more days than not for at least twelve months. Among the symptoms typically present is poor concentration. Pl.’s Mem. of Law at 9 nl5 (citing DSM-IV at 345).
 

 In addition, the Record contains information about plaintiffs treatment at the Anthony Jordan Health Center Comprehensive Alcoholism Outpatient Clinic from May 26, 2000 through October 29, 2001. The various reporters
 
 [8]
 
 made observations of plaintiffs health, which was poor, and noted that his body hurt all over, that he was overweight and suffered from rheumatoid arthritis. Record at 238. In September 2000, plaintiffs counselor noted that he was suffering from relapses and suggested that he needed residential treatment. Record at 249. As of December 28, 2000, plaintiff had abstained from alcohol and cocaine for three days and was planning to enter a halfway house on January 2, 2001. Record at 245. On June 12, 2001, plaintiff was evaluated by his counselor at the Jordan Healthlink Comprehensive Alcoholism Outpatient Clinic. Record at 243. The counselor noted that plaintiff was going to complete six months in the halfway house as of July 3, 2001. The counselor also noted that plaintiff complained of “body pains due to arthritis and can’t sleep.”
 
 Id.
 
 In a psychosocial history and assessment update, completed on June 19, 2001, by a counselor at the Anthony L. Jordan Health Center, the counselor noted that plaintiff felt he needed “to confront the pain and guilt he has carried for 12 years after his daughter was badly burned in a house fire at age 6 and another child died. [Plaintiff] feels if he wasn’t so much into his addiction, the children wouldn’t have been in the house. [Plaintiff] has never dealt with this and has avoided his daughter as much as possible since.” Record at 240.
 

 In a treatment plan review dated September 10, 2001, the counselor at Jordan Healthlink noted that plaintiff wanted a refresher course in reading and writing. Record at 238. Additionally, the report indicates that plaintiff spent his leisure time “playing with the computer — due to health issues [,] can’t do a lot of leisure things.” Record at 238.
 

 HEARING BEFORE THE ALJ
 

 At the hearing, plaintiff testified that he could read the Bible somewhat, but then stated in answer to a follow-up question, “I read it, some of it. I only read some of it. Very few words that I can pick out, yes, no.” Record at 35. He testified that he lives alone in a first floor apartment, that he did some cleaning and shopping, but had a friend “who comes in and helps [him] out and fixes [him] food and helps.... ” Record at 36. He stated that he uses the bus for transportation, but has difficulty getting up and down the steps.
 
 Id.
 
 He also said that the heaviest object he could carry weighed five pounds and that he could carry it for only five minutes at most.
 
 Id.
 
 Plaintiff explained that after that time, his hand locked up and “pain comes into my fingertips ... I can’t hold it for maybe two or three minutes and it falls right out because it seems like the pain comes all over my hands ... and fingertips.” Record at 37. He stated that he could stand for, “maybe 15 minutes, 10 or
 
 *CDLXVI
 
 15 minutes” and could walk for about that time, before having to sit down.
 
 Id.
 
 Prior to residing on his own, plaintiff indicated he lived in a halfway house for individuals recovering from drug and alcohol abuse. Record at 34. He testified he had abstained from cocaine and alcohol for over a year.
 
 Id.
 

 The vocational expert, Manzi, was asked the following hypothetical question by the ALJ:
 

 Assume a person is 50 years old. Has a special education certificate. Simplfe] instructions [are] all he can follow. Assume a person to be on their [sic] feet six hours, lift 20 pounds from table height and then carry it if need be. Occasional stooping, no overhead lifting. Assume he can’t do the past relevant work.... Is there any work such a person can do if I assume that hypothetical?
 

 Record at 40^11. Manzi answered that the ALJ’s hypothetical would “fit the criteria for light, unskilled work.” Record at 41. Manzi suggested one possible job would include cashier II, DOT number 211462010, and that 849,579 such positions existed in the national economy, with 48,-840 in New York, and 2,960 in the “Bigger
 
 [9]
 
 lakes region.” Record at 41-42. Another job Manzi suggested was a ticket taker, DOT number 344667010, of which 32,615 positions existed in the national economy, 2,365 in New York, and 281 in the “bigger [sic] lakes region.” Record at 42.
 

 Just prior to Manzi’s cross-examination by plaintiffs counsel, the ALJ made the following observation pertaining to plaintiffs mental condition and Listing of Impairments 1205(e):
 

 I don’t believe that 1205C is applicable because on account [of] at least 10 years where he did substantial, gainful activity. The IQ score of 72[is] problematical, but it doesn’t really quite make the 70, but there’s a five point spread sometimes, but nonetheless, this man has done substantial gainful activity at least 10 years that I can count. It’s not my current thinking that he meets that by reviewing upon [sic].
 

 Record at 42. Plaintiffs counsel did not make any argument pertaining to the application of 1205(c).
 

 During his cross-examination, plaintiffs counsel asked Manzi if his opinion about the type of work plaintiff could do would be different if plaintiff had to hold a cane for balance all the time. Manzi responded, “[h]e couldn’t do work of a cashier assuming he’s holding onto the cane with one hand. He couldn’t do it with one hand and he couldn’t be a ticket taker in the same way. He would have to be in a sedentary type position.” Record at 43. Counsel then asked whether Manzi would alter his opinion about the type of work plaintiff could perform if he knew that plaintiff was restricted to alternating between sitting, standing and walking every 15 to 20 minutes. Record at 43. Manzi responded, “[afs too frequent to accommodate a ticket taker or for a cashier.” Record at 43. Manzi also testified that, “[s]ome of the cashier positions you can alternate between sitting and standing. I would say maybe 20 percent of them, but you’d have to be able to stand for at least half an hour minimum.” Record at 43. He stated that with regard to a ticket takei', the option to alternate between standing and sitting would not be available.
 
 Id.
 

 ALJ’S DECISION
 

 As discussed earlier, the ALJ found that plaintiff was not disabled. At step one of the five-step analysis, the ALJ found that
 
 *CDLXVII
 
 plaintiff was not performing substantial gainful work. Next, the ALJ found that the medical evidence showed plaintiff suffered degenerative joint disease, borderline intellectual functioning, heart disease with history of infarction, high blood pressure, chronic obstructive pulmonary disease and obesity, impairments which he found were severe within the meaning of the regulations. Record at 20. At step three, the ALJ found that none of plaintiffs impairments met or equaled an impairment listed in Appendix 1, Subpart P, of the regulations. Record at 20. The ALJ found that plaintiff did not retain the residual functional capacity to perform his past work. Record at 21. However, the ALJ found that plaintiff possessed the residual functional capacity to: lift and carry up to 20 pounds occasionally from table height, but not overhead; sit, stand and walk at least six hours a day; follow simple instructions; occasionally stoop; inci-dently climb stairs; and nonrepetitively kneel or squat.
 
 Id.
 

 At step five, the ALJ found that the Commissioner had met its burden of showing that plaintiff had the residual functional capacity to perform some light work, but not the full range of light work. Nevertheless, the ALJ determined there were a significant number of jobs existing in the national economy that plaintiff could perform. Record at 24. Based on the vocational expert’s testimony, the ALJ determined plaintiff could perform work as a Cashier II, and the job of ticket taker, and that there were a significant number of such jobs in the national economy. Record at 24. He concluded that “[a] finding of ‘not disabled’ is therefore reached within the framework of Medical-Vocational Rule 202.13.” Record at 23.
 

 ANALYSIS
 

 As discussed earlier, in this action plaintiff contends that the ALJ’s decision is erroneous and must be reversed because it: (1) failed to properly evaluate plaintiffs claim under the Listing of Impairments 12.05C; (2) is not supported by substantial evidence pertaining to plaintiffs residual functional capacity; (3) improperly evaluates plaintiffs credibility; (4) improperly evaluates plaintiffs claim under the Medical-Vocational guidelines; and (5) incorrectly evaluated the vocational expert’s testimony.
 

 Listing 12.05C
 

 Plaintiff argues that his IQ score of 72 measured at age fifteen, along with other physical and mental impairments, meets the listing found at Appendix 1, 20 C.F.R. Subpart P, Part 404. Pl.’s Mem. of Law at 13. Plaintiff relies on POMS
 
 [10]
 
 § DI 24515.056(d)(1)(c), which states that “IQ scores between 71 and 75 can provide a basis for a determination of
 
 equivalency
 
 to Listing 12.05C.”
 
 Id.
 
 at 14. That section states,
 

 Listing 12.05C is based on a combination of an IQ score with an additional and significant mental or physical impairment. The criteria for this paragraph are such that a medical equivalence determination would very rarely be required. However, slightly higher IQ’s (e.g., 70-75) in the presence of other physical or mental disorders that impose additional and significant work-related limitation of function may support an equivalence determination. It should be noted that generally the higher the IQ, the less likely medical equivalence in combination with another physical or mental impairment(s) can be found.
 

 
 *CDLXVIII
 
 POMS § DI 24515.056(d)(1)(c). In his decision, the ALJ commented that, “[plaintiffs] IQ scores do not meet the criteria for mental retardation because they are well above the 60-70 range.” Record at 20. In that regard, the ALJ in his decision indicated he relied on an April 30, 1996 Wechsler Adult Intelligence Scale-Revised test conducted at the request of the Social Security Administration, on which the resulting score on that test was an IQ of 82.
 

 However, in his reference to a 1996 IQ test and score, the ALJ cited to an exhibit, “erroneously marked B3F in the prior claim.” Record at 20. The present Exhibit B3F, Record at 183-208, contains car-dio-pulmonary medical records “covering the period from 2/7/01 to 6/21/01 from Krishna Rao, MD, Rochester Cardiopulmonary.” Record at 2. None of those records contain the results of any IQ test. The ALJ’s decision does not cite any other source for his information about the 1996 test and the Commissioner’s memorandum of law mentions only the 1965 IQ test score of 72. Def.’s Mem. of Law at 3, 21-22. Thus, the Court is unable to find substantial evidence supporting the ALJ’s determination of a higher IQ score, and will evaluate the ALJ’s decision based only on the 1965 score.
 

 As plaintiff correctly points out, the POMS does permit an ALJ to find an IQ score of 72 to be the equivalent of Listing 12.05C in the presence of other physical or mental disorders that impose additional and significant work-related limitation. The ALJ did not consider this argument, and the Court finds that his determination that plaintiff, with an IQ score of 72 and other physical or mental disorders, did not meet Listing 12.05C is, therefore, not supported by substantial evidence.
 

 Residual Functional Capacity
 

 Plaintiff also disputes the ALJ’s finding that he retained the residual functional capacity to perform some light work. Pl.’s Mem. of Law at 17. He argues that substantial evidence supports a finding that plaintiff suffers from fibromyalgia,
 
 Id,
 
 and objects that the ALJ “dismissed Dr. Anandarajah’s diagnosis....” As the Court indicated above, Dr. Anandarajah stated in his report, “[t]he findings of the tender trigger points and the history of insomnia do
 
 suggest
 
 a diagnosis of fibro-myalgia.” Record at 300 (emphasis added). Dr. Anandarajah was relying, in part, on plaintiffs history of insomnia, in addition to the trigger points and, evidently, lack of inflammatory arthritis, to conclude that he might suffer from fibromyalgia. His notes also indicate, though, that he proposed sleep studies, “to rule out the possibility of sleep apnea.” Record at 300. This would suggest that if plaintiffs sleep is disrupted due to sleep apnea, and not fibromyalgia, that a final diagnosis of fi-bromyalgia would be less likely. However, the Record is incomplete in that there are no sleep study results and no further examinations by Dr. Anandarajah. The Court notes that it is the ALJ’s duty to fully develop the record. As the Second Circuit has noted,
 

 Because a hearing on disability benefits is a non-adversarial proceeding, the ALJ generally has an affirmative obligation to develop the administrative record.
 
 Echevarria v. Secretary of Health & Human Servs.,
 
 685 F.2d 751, 755 (2d Cir.1982). This duty exists even when the claimant is represented by counsel or, as here, by a paralegal.
 
 See Baker v. Bowen,
 
 886 F.2d 289, 292 n. 1 (10th Cir.1989) (“The ALJ ... has the affirmative duty to fully and fairly develop the record regardless of whether the applicant is represented by an attorney or a paralegal.”). The Secretary’s regu
 
 *CDLXIX
 
 lations describe this duty by stating that, “before we make a determination that you are not disabled, we will develop your complete medical history ... [and] will make every reasonable effort to help you get medical reports from your own medical sources when you give us permission to request the reports.” 20 C.F.R. § 404.1512(d). The regulations also state that, “when the evidence we receive from your treating physician ... or other medical source is inadequate for us to determine whether you are disabled, ... we will first recontact your treating physician ... or other medical source to determine whether the additional information we need is readily available.” 20 C.F.R. § 404.1512(e).
 

 Perez v. Chater,
 
 77 F.3d 41, 47 (2d Cir.1996). The ALJ failed to clarify Dr. An-andarajah’s “suggested” diagnosis by contacting him to determine whether additional information on his fibromyalgia diagnosis was readily available. Thus, the ALJ’s determination that plaintiff did not suffer from fibromyalgia is not supported by substantial evidence in the record.
 

 Restrictions on Light Duty
 

 Plaintiff cites as error the ALJ’s rejection of Dr. Sirotenko’s determination that plaintiff was restricted to the need to use a cane and take frequent breaks, a determination that plaintiff claims was supported by his own treating physician, Dr. Slobard. Pl.’s Mem. of Law at 19; Record at 209. Dr. Sirotenko wrote, in pertinent part, that plaintiff “will require the use of a cane for support and balance on an as needed basis,” and “should be given frequent opportunities to change positions throughout the day, alternating between sitting, standing and walking every 15 to 20 minutes.” Record at 215. He also noted that plaintiffs “general appearance is that of a man who utilizes a cane and has a mildly antalgic gait.... He was able to ambulate about the room, however he intermittently touched furniture for support.” Record at 213. The ALJ noted that Dr. Sirotenko examined plaintiff at the request of the Social Security Administration. However, he concluded that Dr. Sirotenko’s findings were entitled to little weight, “because they appear to be based solely on subjective complaints and are not supported by objective findings from any other treating or examining physician. In fact, no other treating or examining physician has found any limitations in range of motion or muscle strength (20 CFR 416.927).” Record at 19. Subparagraph (c) of the regulation cited by the ALJ states,
 

 (c) Making disability determinations. After we review all of the evidence relevant to your claim, including medical opinions, we make findings about what the evidence shows.
 

 (1) If all of the evidence we receive, including all medical opinion(s), is consistent, and there is sufficient evidence for us to decide whether you are disabled, we will make our determination or decision based on that evidence.
 

 (2) If any of the evidence in your case record, including any medical opinion(s), is inconsistent with other evidence or is internally inconsistent, we will weigh all of the evidence and see whether we can decide whether you are disabled based on the evidence we have.
 

 (3) If the evidence is consistent but we do not have sufficient evidence to decide whether you are disabled, or, if after weighing the evidence we decide we cannot reach a conclusion about whether you are disabled, we will try to obtain additional evidence under the provisions of §§ 416.912 and 416.919 through 416.919h. We will request additional existing records, recontact your
 
 *CDLXX
 
 treating sources or any other examining sources, ask you to undergo a consultative examination at our expense, or ask you or others for more information. We will consider any additional evidence we receive together with the evidence we already have.
 

 20 C.F.R. 416.927(c). The ALJ adopted Dr. Sirotenko’s opinion that plaintiff was limited to lifting objects of twenty pounds or less on an intermittent basis, provided they were at table height, that he should avoid lifting any object over his head, and that he should only occasionally stoop, kneel, squat and incidently climb stairs, but rejected Dr. Sirotenko’s conclusions that plaintiff needed a cane and needed to frequently change positions. Record at 21. Plaintiffs treating physician checked the blocks on a Social Security form indicating that he found plaintiff “moderately limited” in walking, standing and sitting. Record at 209. While this does not conclusively establish that plaintiff needed a cane for balance when standing or walking, at the very least, it should have led the ALJ to obtain further evidence from Dr. Slobard before rejecting Dr. Sirotenko’s opinion about the need for a cane and changing positions frequently throughout the day, as well as Dr. Slobard’s indications on the Social Security form that plaintiff was “moderately limited” in walking, standing and sitting. The Court determines that the ALJ’s decision to reject Dr. Siroten-ko’s determinations about a cane and changing position without first attempting to obtain clarification was erroneous as a matter of law.
 
 See Perez v. Chater,
 
 77 F.3d at 47.
 

 Plaintiff also disputes the ALJ’s finding that he is a high school graduate. Pl.’s Mem. of Law at 21. However, the Court finds that the ALJ’s decision in that regard is supported by substantial evidence. In his Disability Report, dated April 24, 2001, plaintiff relates that he completed twelfth grade at Benjamin Franklin High School, that he attended special education classes, and was in a “general” program. Record at 135. Plaintiffs contention that he should be considered as having limited or less education is not supported in the record. To the extent that evidence in the record supports plaintiffs contention that his reading ability is limited, the Court does not find that this undermines the ALJ’s determination that plaintiff is a high school graduate.
 

 Plaintiff’s Credibility
 

 With regard to evaluating a claimant’s credibility,
 

 [t]he regulations set forth a two-step process to evaluate a claimant’s testimony regarding his symptoms. First, the ALJ must consider whether the claimant has a medically determinable impairment which could reasonably be expected to produce the pain or symptoms alleged by the claimant. Second, if the ALJ determines that the claimant is impaired, he then must evaluate the intensity, persistence, and limiting effects of the claimant’s symptoms. If the claimant’s statements about his symptoms are not substantiated by objective medical evidence, the ALJ must make a finding as to the claimant’s credibility. Such an evaluation of a claimant’s credibility is entitled to great deference if it is supported by substantial evidence.
 

 In assessing the claimant’s credibility, the ALJ must consider all of the evidence in the record and give specific reasons for the weight accorded to the claimant’s testimony. The regulations require the ALJ to consider not only the objective medical evidence, but also:
 

 1. The individual’s daily activities;
 

 
 *CDLXXI
 
 2. The location, duration, frequency, and intensity of the individual’s pain or other symptoms;
 

 3. Factors that precipitate and aggravate the symptoms;
 

 4. The type, dosage, effectiveness, and side effects of any medication the individual takes or has taken to alleviate pain or other symptoms;
 

 5. Treatment, other than medication, the individual receives or has received for relief of pain or other symptoms;
 

 6. Any measures other than treatment the individual uses or has used to relieve pain or other symptoms ...; and
 

 7. Any other factors concerning the individual’s functional limitations and restrictions due to pain or other symptoms.
 

 Murphy v. Barnhart,
 
 No. 00Civ.9621(JSR)(FM), 2003 WL 470572 at *10-11 (S.D.N.Y. Jan. 21, 2003)
 
 (citing
 
 20 C.F.R. § 404.1529(c)) (other citations and internal quotations omitted).
 

 In making his determination of plaintiffs credibility, the ALJ wrote that he “does not give great weight to the [plaintiffs] testimony because of his long history of alcoholism and illegal cocaine use. While the record indicates the [plaintiff] denied having a problem with alcoholism, this appears to be untrue because the claimant went through a substance addiction rehabilitation program for over a year.” Record at 21.
 

 Social Security Ruling 96-7p, entitled, “Policy Interpretation Ruling Titles II and XVI: Evaluation of Symptoms in Disability Claims: Assessing the Credibility of an Individual’s Statements”, states, in part,
 

 whenever the individual’s statements about the intensity, persistence, or functionally limiting effects of pain or other symptoms are not substantiated by objective medical evidence, the adjudicator must make a finding on the credibility of the individual’s statements based on a consideration of the entire case record. This includes the medical signs and laboratory findings, the individual’s own statements about the symptoms, any statements and other information provided by treating or examining physicians or psychologists and other persons about the symptoms and how they affect the individual, and any other relevant evidence in the case record.
 

 SSR-96-7p. Here, the ALJ did not give “great weight to the [plaintiffs] testimony” simply because of his history of alcoholism and drug abuse. Record at 21. However, the SSR requires more. The ALJ was required to assess plaintiffs subjective complaints and testimony in light of the evidence in the record, not merely on the basis of plaintiffs past history of addiction.
 
 Cf. Hilton v. Comm’r of Soc. Sec.,
 
 No. 3:01 CV 1164(JBA), 2002 WL 32152290, *9, 2002 U.S. Dist. LEXIS 26655, *29 (D.Conn. Nov. 25, 2002) (plaintiffs subjective complaints were not corroborated in the medical records and were not consistent with his admitted daily activities). Thus, the ALJ’s credibility determination was not made in accordance with the regulatory requirements.
 

 Significant number of jobs in the national economy
 

 The ALJ properly called a vocational expert to testify about whether, considering plaintiffs limitations, there was a significant number of jobs in the national economy plaintiff could perform.
 
 See Bapp v. Bowen,
 
 802 F.2d 601 (2d Cir.1986); Pl.’s Mem. of Law at 22. However, the vocational expert’s opinion is only useful if the factual information given accurately reflects the plaintiffs condition. In this ease, the hypothetical question submitted by the ALJ omitted two factors: plaintiffs reliance on a cane, and his need
 
 *CDLXXII
 
 to frequently change positions from sitting to standing. When plaintiffs counsel added those two facts to the hypothetical question posed by the ALJ, the vocational expert’s opinion significantly changed. Record at 40-42. In view of the Court’s findings, above, that the ALJ’s decision was erroneous as a matter of law, or unsupported by substantial evidence, in the determination that Dr. Sirotenko’s conclusions that plaintiff required the use of a cane and needed to change his position should be rejected, and plaintiff was incredible because he was an alcoholic and drug abuser, the hypothetical question the ALJ posed to the vocational expert may not have been an accurate description of plaintiffs condition. If, on reconsideration, the ALJ determines that plaintiff did require the use of a cane and needed to change his position frequently during the day, then the vocational expert’s conclusion about light work available to plaintiff would not support the Commissioner’s burden at step five of the five-step sequential analysis. Thus, in light of the above, the ALJ’s decision is reversed.
 

 CONCLUSION
 

 For all of the foregoing reasons, this matter is remanded for a new hearing pursuant to the fourth sentence of 42 U.S.C. § 405(g).
 

 So Ordered.
 

 [1]
 

 . Plaintiff filed one previous application. On September 26, 1997, his claim for disability benefits was denied in an Administrative Law Judge's decision, but that decision was remanded by the Appeals Counsel for further proceedings. In a decision dated July 25, 2000, the Administrative Law Judge again denied the application and plaintiff did not pursue that claim any further. Record at 16.
 

 [2]
 

 . Plaintiff’s Social Security application, dated April 24, 2001, alleges a disability onset date of January 1, 1994. Record at 110. However, in another form, he alleges he stopped
 
 *CDLIX
 
 working due to medical problems on October 15, 1989. Record at 129.
 

 [3]
 

 . In certain selected sites, the Social Security Administration employed a test process that eliminated the reconsideration step prior to a hearing before an Administrative Law Judge.
 
 See
 
 20 C.F.R. § 416.1406(b)(4) (2003); 60 F.R. 20023 (Apr. 24, 1995). This case apparently fell within that test process as there was no reconsideration of the initial denial.
 

 [4]
 

 . Plaintiff's memorandum of law, at 2. Title 42 U.S.C. § 1383(c)(3), states, ''[t]he final determination of the Commissioner of Social Security after a hearing under paragraph (1) shall be subject to judicial review as provided in section 205(g) [42 USCS § 405(g) ] to the same extent as the Commissioner’s final determinations under section 205 [42 USCS § 405].”
 

 [5]
 

 . Plaintiff contended that Dr. Twilliger's opinion was that plaintiff should be restricted; however, as shown by the above quote from the report, it appears to the Court that Dr. Twillger was simply restating what plaintiff was relating to him.
 
 C.f.
 
 Pl.’s Mem. of Law at 3.
 

 [6]
 

 . Possibly a shorthand manner of staling, "shortness of breath.”
 

 [7]
 

 . The date on the form is somewhat difficult to read, especially the two digits of the year, but appears to be ''01.''
 

 [8]
 

 . The reports are signed, but the signatures are not sufficiently legible to specifically identify the various counselors' names.
 

 [9]
 

 . [sic]; probably a reference to the "Finger Lakes region."
 

 [10]
 

 . Social Security Administration’s Program Operations Manual System, available at http://www.socialsecurity.gov/regulations/in-dex.htm.