**Nina GREEN–YOUNGER,**
**Plaintiff–Appellant,**

v.

**Joanne B. BARNHART, Commissioner**
**of the Social Security Administration,**
**Defendant–Appellee.**

**Docket No. 02–6133.**

United States Court of Appeals,
Second Circuit.

Argued: March 20, 2003.

Decided: July 10, 2003.

Charles A. Pirro III, Pirro & Church, LLC, South Norwalk, CT, for Petitioner–Appellant.

Ann M. Nevins, Bridgeport, CT, (Kevin J. O'Connor, United States Attorney for the District of Connecticut; Patrick J. Caruso; Jeffrey A. Meyer, of counsel), for Appellee.

Before: FEINBERG, VAN GRAAFEILAND and F.I. PARKER, Circuit Judges.

FEINBERG, Circuit Judge.

Plaintiff Green–Younger appeals from a judgment of the United States District Court for the District of Connecticut (Christopher F. Droney, J.), accepting the recommended ruling of Magistrate Judge William I. Garfinkel to affirm the decision of the Administrative Law Judge (ALJ) denying Green–Younger's application for social security disability benefits. On appeal, Green–Younger argues that the ALJ and the district court erred by failing to give controlling weight to the opinion of her treating physician that she suffers from fibromyalgia[1] and cannot work because of severe pain. For reasons stated below, we reverse and remand to the district court with instructions to remand the matter to the Commissioner of the Social Security Administration (SSA) for a calculation of disability benefits.

## I. Background

At the time of her SSA hearing, Nina Green–Younger was 38 years old, and married with three children. After completing two years of college, Green–Younger worked full-time as a long-distance telephone operator for Southern New England Telephone (SNET) from 1978 to 1995. She also worked part-time as a mail sorter from 1985 to 1988. From 1988 to 1995, Green–Younger took seven disability leaves from her job, which lasted between one month and one year, before being placed on long-term disability in 1997. Green–Younger avers that she became totally disabled in May 1995, when she last worked.

## A. Medical History

According to medical records and her testimony, Green–Younger's difficulties began in 1982 when she injured her back in a motor vehicle accident in the eighth month of her last pregnancy. To treat her back pain, she tried various anti-inflammatory and pain medications, physical therapy and chiropractic treatment. In April 1991, Green–Younger consulted an orthopedist who diagnosed degenerative disc disease. A 1991 MRI showed degeneration in the "4–5 and 5–1" regions. A 1992 discogram, while normal at L4–L5, showed that L5–S1 was "severely degenerated."

Beginning February 1994, Green–Younger began regular treatments with osteopath Dr. Jeffrey Helfand, a rheumatologist. After an initial consultation and examination, Dr. Helfand reported that Green–Younger complained of

pain in her right leg and low back which she states goes down into her coccyx area associated with tingling and weakness in her right arm which has been present intermittently since 1982. She states that the pain is always present but can be more severe at sometimes than at others.... She states she has difficulty sitting or standing for any prolonged time and complains of frequent sleep difficulty. The most recent prolonged episode of low back and leg pain began around October 1993 after approximately a six-month period when she was relatively symptom free.

Dr. Helfand documented that "[m]usculoskeletal and extremity exams reveal multiple tender points in the distribution characteristic of fibromyalgia." He noted the results of a 1993 MRI showing minimal

---

1. A syndrome of chronic pain of musculoskeletal origin but uncertain cause. Stedman's Medical Dictionary 671 (27th ed.2000). This disorder is also commonly referred to as fibrositis.

disc bulging at the L4–L5 and L5–S1 regions, but no disc herniation. Dr. Helfand found no reflex, sensory, or motor deficits, but he noted the presence of paresthesias[2]; significant spasm with limitation of lateral flexion and rotation in the lumbar paravertebral muscles; and marked tenderness over the posterior superior iliac spines bilaterally. Dr. Helfand eventually diagnosed Green–Younger as having fibromyalgia, as well as other illnesses—such as degenerative disc disease, chronic low back syndrome, and peroneal neuropathy[3]—associated with her back pain.

Green–Younger, who had taken a disability leave in January 1994, tried unsuccessfully to return to work after beginning treatment with Dr. Helfand. In April 1994, Dr. Helfand reported that she was "quite depressed and distraught regarding her condition and her persistent inability to go to work." The pain medications he prescribed, like many others Green–Younger had tried, did not provide her any significant relief.[4] Although Dr. Helfand continued to prescribe medication, he noted that "there is probably little to suggest she will have any improvement from any further trials with NSAID's."[5] In September 1994, Dr. Helfand informed SNET, Green–Younger's employer, that her return-to-work date was indeterminate.

Dr. Helfand referred Green–Younger to Dr. Gary Dee at Norwalk Hospital, a specialist in pain management. In October 1994, Dr. Dee began treating Green–Younger with a series of epidural blocks and steroid trigger point injections. An MRI of the lumbar spine performed at this time revealed a mild asymmetrical disc bulge at the L4–L5 and L3–L4 regions. Dr. Helfand recorded that Green–Younger had "some improvement" following the trigger point injections and was "able to better tolerate massage therapy." Dr. Helfand's later progress notes, however, show that the injections afforded her only "short-term relief." He reported that Green–Younger "continues to have chronic pain which has been limiting her ability for physical activity and for work" and "has had no relief with mild narcotic analgesics such as Darvocet or Vicodin."

Green–Younger and Dr. Helfand discussed her prognosis and ability to return to work. A SNET representative had informed them that Green–Younger's job would be terminated in January 1995 unless she returned. SNET's position was clear that they did not want her to "work a few weeks and then be out." Dr. Helfand recorded his view that "it is unlikely that she will be able to return to work full-time for any significant duration." Rather than recommend applying for long-term disability, however, he suggested that Green–Younger "try to go back to work part-time for 2–3 weeks at four hours daily and [see] how she does."

Green–Younger returned to work in early December 1994 on a part-time basis. A few weeks later, Dr. Helfand noted that Green–Younger was "having somewhat of a difficult time but has decided to continue as long as she can." She continued until early May 1995, at which time she stopped working because of "severe low back tenderness and paresthesias in the lower extremities." Green–Younger also complained of pain in her upper back and right arm and hand. A physical exam showed a

**2.** An abnormal sensation such as burning, prickling, tingling or tickling. *Stedman's Medical Dictionary* 1316.

**3.** A disorder affecting the nerve extending along the fibula. *Id.* at 1211, 1354.

**4.** Green–Younger was prescribed 18 different drugs in 1994 and 1995.

**5.** Nonsteroidal anti-inflammatory drugs.

positive Tinel sign indicative of carpal tunnel syndrome. While an EMG performed in June did not show evidence of nerve entrapment, a subsequent EMG did.

In July 1995, Dr. Helfand wrote several letters describing Green–Younger's current limitations. In one letter requesting a medical exemption from jury service, Dr. Helfand explained that it was "difficult for [Green–Younger] to sit in any one position for more than 30 minutes without needing to get up and walk around." In other letters, he described her current limitations to include "sitting and/or standing for 4 hours or less daily," or "continuous sitting/and or sitting for no more than 60 minutes without a rest period," and no lifting, pulling or pushing.

In August 1995, physical therapist Jill Tomasello performed a two-day work fitness evaluation of Green–Younger for SNET. Tomasello found that "test results did not meet the criteria for consistent or maximum effort," explaining that "[t]his is not unusual for the initial test" and that "repeat testing is needed to verify the results." Tomasello nevertheless concluded that Green–Younger "has demonstrated the ability to work at a sedentary work level," and recommended a work hardening program if she is "unable to tolerate a return to work." However, a subsequent evaluation performed in July 1996 suggested that Green–Younger "was able to tolerate seated activity at a work site for a maximum of 30 minutes before she would need to get up and move around freely."

In October 1995, Dr. Helfand informed SNET that Green–Younger could not return to work because of fibromyalgia, peroneal neuropathy, and chronic low back syndrome. Dr. Helfand explained in his progress notes that he had elected to consider her permanently disabled because "she has not had any dramatic improvement with any of the measures we have tried."

Dr. Helfand referred Green–Younger to a number of other doctors. Dr. Don Goldenberg, Chief of Rheumatology at the Newton–Wellesley Hospital in Massachusetts and a fibromyalgia specialist, confirmed Dr. Helfand's diagnosis of fibromyalgia. Dr. Robert Goldring, who was providing chiropractic treatment at this time to alleviate pain and spasms, stated that Green–Younger's "long term pain" was "essentially due to her fibromyalgia." Green–Younger also consulted with orthopedist Dr. Ramon Batson. On a physical exam, he found "diffuse tenderness to palpation along the axial spine and in the SI joints bilaterally" and "trigger points present in the right trapezius muscles and in the right glutei." Dr. Batson noted Green–Younger's history of disc disease but not disc herniation, and recommended treatment for myofascial pain syndrome [6] if studies proved negative for surgical pathology.

A number of tests were ordered, apparently in part to rule out surgical pathology. Plain films did not reveal any abnormal movement or osseous lesions, but an MRI of the lumbar spine taken in 1995 again revealed bulging at the L3–L4 and L4–L5 regions. Green–Younger underwent a full body scan in July 1996. The scan revealed "one significant abnormality: there is increased activity in the right sacroiliac joint which may represent sacroiliitis [7] or a consequence of previous trauma." Dr. Hel-

6. According to the medical articles included in Green–Younger's brief, myofascial pain syndrome is a disorder closely related to fibromyalgia.

7. An inflammation of the sacroiliac joint, which connects the sacrum, or lower back forming part of the pelvis, to the ilium, or hip bone. Stedman's Medical Dictionary at 1587–88, 875.

fand pursued the possibility of implanting a spinal cord stimulator, but abandoned this option after neurosurgeon Dr. Charles Needham "excluded any significant nerve compression disease and any surgical approach to management."

In July 1996, Dr. Helfand again diagnosed Green–Younger with "severe fibromyalgia." He explained that fibromyalgia is "typically characterized by severe fatigue, diffuse muscular soreness and tenderness which in certain instances can be debilitating." He noted the difficulty of proving disability on this basis because of the absence of objective evidence to quantify the severity of the pain. He reported that "her pain is frequently overwhelming and the associated fatigue can cause a significant limitation in her ability to function on a daily basis." Dr. Helfand opined that "her ability to function at a normal level because of the persistent, severe pain is markedly limited." In a December 1998 letter to Green–Younger's attorney, Dr. Helfand explained that "she continues to experience significant difficulty with her activities of daily living," and noted a "relatively acute onset of severe tenderness and stiffness ... with multiple tender points." He concluded that "it should probably be obvious that she continues to have significant disability and at this time will most likely be unable to retain any significant gainful employment."

### B. Procedural History

In August 1995, Green–Younger filed an application for disability benefits.[8] The SSA denied her application initially in October 1995 and upon reconsideration in December 1995. The SSA consulting physicians disagreed with Dr. Helfand's conclusion that Green–Younger was "limited to sitting and/or standing for four hours or less," because "[e]vidence does not show deficits of motor function or significant arthritis to severely limit standing or sitting." Green–Younger sought a review before an ALJ of the SSA Office of Hearings and Appeals.[9] A hearing was conducted in August 1997. Green–Younger, who was represented by counsel, testified on her own behalf with regard to her medical history and daily limitations, including her inability to do most housework or to sit or stand comfortably for more than 30 minutes. Jeff Blanks, Ph.D., a vocational expert, also testified. He identified Green–Younger's past work as a telephone operator and mail clerk as semi-skilled and unskilled, respectively, and sedentary in nature. The ALJ asked Dr. Blanks whether an individual could perform Green–Younger's past work if she could sit for six hours a day and stand and walk for a total of two hours a day, or alternatively sit or stand at least every hour. Dr. Blanks answered that the individual could perform Green–Younger's past work as a mail clerk but not as a telephone operator. Green–Younger's counsel, in turn, asked him whether an individual who could sustain the sitting position for only about 30 minutes at a time, sit and/or stand for a total of only four hours and tolerate upper body activities for only two minutes at a time would be able to perform Green–Younger's past work. Dr. Blanks answered no and also opined, on counsel's inquiry, that there is no other type of job a person with those limitations might be able to perform.

---

8. This was Green–Younger's second application. She first applied for disability benefits in January 1989 but was denied. She did not appeal that decision.

9. The SSA initially denied this request as untimely and dismissed the case. In October 1996, the dismissal was vacated at Green–Younger's request. In May 1997, the SSA Appeals Council remanded the dismissal to an ALJ with instructions to hold a hearing.

In September 1997, the ALJ issued a decision denying Green–Younger's application. Although the ALJ found that the "medical evidence of record documents that the claimant has fibromyalgia and degenerative disc disease" and that these impairments were severe, the ALJ also found that Green–Younger retained the residual functional capacity to occasionally lift and carry up to 10 pounds, sit for six hours a day and walk or stand for two hours a day. The ALJ concluded that Green–Younger could perform her past work as a mail clerk and therefore was not disabled within the meaning of the Social Security Act. Specifically, the ALJ found that "[c]ontrary to the claimant's persistent complaints of pain, there are no objective medical findings." He noted in this regard that there was no "evidence of radiculopathy," "signs of sacroilitis," "abnormal chest examinations," or "abnormal movement or osseous lesions." As a result, the ALJ found that (1) the opinions of Dr. Helfand regarding Green–Younger's limitations "cannot be afforded extra weight because they are not well-supported by medically acceptable clinical and laboratory diagnostic techniques, and are inconsistent with the other substantial evidence of record," namely physical therapist Tomasello's work capacity evaluation; and (2) Green–Younger's "allegations of pain and functional limitations are . . . not entirely credible in light of the minimal objective medical findings." In total, the ALJ's six-page opinion referred five times to a lack of objective evidence. Finally, the ALJ also noted that Green–Younger was currently taking only one medication for her pain, and that "the evidence does not show that there have been any changes in her condition from prior to that time when she had worked while also receiving treatment for her alleged impairments."

The SSA Appeals Council affirmed the ALJ's decision and Green–Younger timely appealed to the United States District Court for the District of Connecticut, asserting numerous grounds for remand. In August 2001, Magistrate Judge William Garfinkel issued a lengthy ruling recommending affirmance of the ALJ's decision. In March 2002, the district court entered a brief order accepting the recommended ruling in its entirety.

This appeal followed.

## II. Discussion

In this court, Green–Younger argues that the ALJ misapplied SSA regulations by failing to give controlling weight to the opinion of her treating physician that she suffers from fibromyalgia and that the attendant pain and fatigue severely limit her ability to function and work on a daily level. She argues that the ALJ, as well as the district court, misunderstood the nature of fibromyalgia in requiring "objective" evidence beyond those clinical signs and symptoms necessary for a diagnosis. The government notes that the ALJ did credit Dr. Helfand's diagnosis of fibromyalgia, but argues that his conclusion on the ultimate issue of legal disability was not entitled to controlling weight and that substantial evidence supports the ALJ's decision.

### A. Standard of Review

██ "When deciding an appeal from a denial of disability benefits, we focus on the administrative ruling rather than the district court's opinion." *Curry v. Apfel,* 209 F.3d 117, 122 (2d. Cir.2000) (citing *Schaal v. Apfel,* 134 F.3d 496, 500–01 (2d Cir.1998)). We conduct a plenary review of the administrative record to determine "whether the Commissioner's conclusions 'are supported by substantial evidence in the record as a whole or are based on an erroneous legal standard.'" *Id.* (internal

citation omitted); see also *Balsamo v. Chater*, 142 F.3d 75, 79 (2d Cir.1998). Substantial evidence "means such relevant evidence as a reasonable mind might accept as adequate to support a conclusion.'" *Curry*, 209 F.3d at 122 (quoting *Richardson v. Perales*, 402 U.S. 389, 401, 91 S.Ct. 1420, 28 L.Ed.2d 842 (1971)).

## B. Merits

■ To be eligible for disability benefits under the Social Security Act, a claimant must establish "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment ... which has lasted or can be expected to last for a continuous period of not less than 12 months." 42 U.S.C. § 423(d)(1)(A). The SSA has promulgated regulations prescribing a five-step analysis for evaluating disability claims. "In essence, if the Commissioner determines (1) that the claimant is not working, (2) that he has a 'severe impairment,' (3) that the impairment is not one [listed in Appendix 1 of the regulations] that conclusively requires a determination of disability, and (4) that the claimant is not capable of continuing in his prior type of work, the Commissioner must find him disabled if (5) there is not another type of work the claimant can do." *Draegert v. Barnhart*, 311 F.3d 468, 472 (2d Cir.2002); see also *Shaw v. Chater*, 221 F.3d 126, 132 (2d Cir.2000). The claimant bears the burden of proof on the first four steps, while the SSA bears the burden on the last step. See *id.*

In this case, as we have indicated, the ALJ found that Green–Younger has fibromyalgia and degenerative disc disease; that her impairments were severe but did not equal or exceed a listed impairment; and that she had the residual functional capacity to do sedentary work, involving six hours a day of sitting and two hours of standing or walking. The ALJ rejected the contrary opinion of Green–Younger's treating physician, Dr. Helfand, that her limitations were more severe.

■ The SSA recognizes a "treating physician" rule of deference to the views of the physician who has engaged in the primary treatment of the claimant. "A treating physician's statement that the claimant is disabled cannot itself be determinative." *Snell v. Apfel*, 177 F.3d 128, 133 (2d Cir. 1999). However, SSA regulations advise claimants that "a treating source's opinion on the issue(s) of the *nature and severity of your impairment(s)*" will be given "controlling weight" if the opinion is "well supported by medically acceptable clinical and laboratory diagnostic techniques and is not inconsistent with the other substantial evidence in your case record." 20 C.F.R. § 404.1527(d)(2) (emphasis added). See also Shaw, 221 F.3d at 134; *Rosa v. Callahan*, 168 F.3d 72, 78–79 (2d Cir.1999) ("[T]he ALJ cannot arbitrarily substitute his own judgment for competent medical opinion.").

■ We conclude from the record before us that the ALJ erred by failing to give controlling weight to the treating physician's opinion and effectively requiring objective evidence beyond the clinical findings necessary for a diagnosis of fibromyalgia under established medical guidelines. Dr. Helfand's opinion regarding Green–Younger's impairments meets the standard under the SSA regulations and should have been accorded controlling weight. Contrary to the government's contention, Dr. Helfand was not offering an opinion on the ultimate issue of legal disability, but rather on the "nature and severity of [Green–Younger's] impairment(s)." He opined that "her ability to function at a normal level because of the persistent, severe pain is markedly limited," noting specifically that she could not

sit or stand for more than four hours a day, that she could not continuously sit or stand for 60 minutes without a rest period, and that it was difficult for her to sit for more than 30 minutes at a time.[10]

At the time of the hearing in 1997, Dr. Helfand had coordinated Green–Younger's care for over three years, during which time she underwent numerous physical examinations and diagnostic procedures.[11] Dr. Helfand's diagnosis of severe fibromyalgia and degenerative disc disease are "well supported by medically acceptable clinical and laboratory diagnostic techniques." Green–Younger exhibited the clinical signs and symptoms to support a fibromyalgia diagnosis under the American College of Rheumatology (ACR) guidelines, including primarily widespread pain in all four quadrants of the body and at least 11 of the 18 specified tender points on the body. See SSA Memorandum, Fibromyalgia, Chronic Fatigue Syndrome, and Objective Medical Evidence Requirements for Disability Adjudication, at 5 (May 11, 1998) (explaining that the signs for fibromyalgia, according to the ACR, "are primarily the tender points"); see also *Sarchet v. Chater*, 78 F.3d 305, 306 (7th Cir.1996); *Lisa v. Sec. of the Dep't of Health and Human Servs.*, 940 F.2d 40, 43 (2d Cir.1991). As noted earlier, Dr. Helfand documented that "[m]usculo-skeletal and extremity exams reveal multiple tender points in the distribution characteristic of fibromyalgia." A number of other doctors, including a fibromyalgia specialist, concurred in that diagnosis, presumably using proper diagnostic techniques.[12] In addition, several MRIs showed some bulging in her discs and several doctors concurred that Green–Younger had a history of degenerative disc disease.

The fact that Dr. Helfand also relied on Green–Younger's subjective complaints hardly undermines his opinion as to her functional limitations, as "[a] patient's report of complaints, or history, is an essential diagnostic tool." *Flanery v. Chater*, 112 F.3d 346, 350 (8th Cir.1997). Partly in an effort to avoid long-term disability status for Green–Younger, Dr. Helfand ordered various treatments, including medication, trigger point steroid injections and epidural blocks, and physical and chiropractic therapy. He personally monitored the effectiveness of various therapies and found that they failed to provide any significant improvement in Green–Younger's condition.

By contrast, the only evidence which might be inconsistent with Dr. Helfand's opinion is not substantial—that is, it cannot reasonably support the conclusion that appellant can work. The ALJ relied on the 1995 work fitness evaluation conducted by physical therapist Tomasello. Given that Tomasello was not a physician, that she stated that her conclusion was based on inconsistent results and required verification, and that a subsequent evaluation produced contrary results, Tomasello's one-shot evaluation is not substantial evidence. Similarly, the reports of two SSA consulting physicians, who did not examine Green–Younger, are also not substantial evidence. The first appears to rely entirely

---

**10.** The government argues that Dr. Helfand's opinion that appellant could not continuously sit or stand for more than one hour is inconsistent with his statement that it would be difficult for her to sit for more than thirty minutes. In fact, having difficulty sitting for half an hour and being unable to sit continuously for one hour are completely consistent with one another.

**11.** As of the time of the appeal in May 2002, Dr. Helfand had treated Green–Younger for eight years.

**12.** That was certainly the contention in Green–Younger's brief and at oral argument and the government did not dispute it.

on Tomasello's report, whereas the second found that Green–Younger could perform sedentary work because "[e]vidence does not show deficits of motor function or significant arthritis to severely limit sitting or standing." However, Green–Younger was not complaining of deficits in motor functioning or arthritis, she was complaining of debilitating pain from fibromyalgia.

■ It also appears to us that the ALJ, like the SSA consulting physicians, did not actually credit Dr. Helfand's diagnosis of fibromyalgia or misunderstood its nature. The ALJ effectively required "objective" evidence for a disease that eludes such measurement. As a general matter, "objective" findings are not required in order to find that an applicant is disabled.[13] See *Donato v. Sec. of Dep't of Health and Human Servs.*, 721 F.2d 414, 418–19 (2d Cir.1983) ("Subjective *pain* may serve as the basis for establishing disability, even if … unaccompanied by positive clinical findings of other 'objective' medical evidence") (emphasis in original) (citation omitted); *Cruz v. Sullivan*, 912 F.2d 8, 12 (2d Cir.1990); *Eiden v. Secretary of Health, Educ., and Welfare*, 616 F.2d 63, 65 (2d Cir.1980); *Cutler v. Weinberger*, 516 F.2d 1282, 1286–87 (2d Cir.1975); *Cline v. Sullivan*, 939 F.2d 560, 566 (8th Cir.1991).

■ Moreover, a growing number of courts, including our own, see *Lisa*, 940 F.2d at 44–45, have recognized that fibromyalgia is a disabling impairment and that "there are no objective tests which can conclusively confirm the disease." *Preston v. Sec. of Health and Human Servs.*, 854 F.2d 815, 818 (6th Cir.1988); see *Sar-*

*chet*, 78 F.3d at 306; see also *Harman v. Apfel*, 211 F.3d 1172, 1179–80 (9th Cir. 2000); *Kelley v. Callahan*, 133 F.3d 583, 585 n. 2 (8th Cir.1998). Yet each of the ALJ's determinations turned on a perceived lack of objective evidence. First, the ALJ determined that Dr. Helfand's opinion was not "well supported by medically acceptable clinical and laboratory diagnostic techniques" because of a lack of "objective" findings.[14] Second, the ALJ determined that Dr. Helfand's opinion was "inconsistent with other substantial evidence," namely Tomasello's work fitness evaluation, because it was not supported by "objective" findings. Finally, the ALJ also found that Green–Younger's "allegations of pain and functional limitations are found not to be entirely credible, particularly in light of the minimal objective findings."

As we have discussed, the ALJ erred in not giving controlling weight to Dr. Helfand's opinions. With regard to the issue of Green–Younger's credibility, her complaints of pain in her back, legs, and upper body, fatigue, and disturbed sleep are internally consistent and consistent with common symptoms of fibromyalgia. Dr. Helfand's diagnosis of fibromyalgia bolsters the credibility of Green–Younger's complaints. See *Lisa*, 940 F.2d at 44. By comparison, the reasons suggested by the ALJ simply do not undermine her credibility. First, the ALJ found that the relative lack of physical abnormalities undercut her credibility.[15] However, we have recognized that "[i]n stark contrast to the unremitting pain of which fibrositis patients complain, physical examinations will usual-

13. In concluding otherwise, the magistrate judge cited a case from the Eastern District of Illinois, *May v. Apfel*, 1999 WL 1011927, at 14 (N.D.Ill.1999), which both misstated the underlying law and appears to be contrary to Seventh Circuit precedent that allows fibromyalgia to be the basis for a disability deter-

mination even though "its symptoms are entirely subjective." Sarchet, 78 F.3d at 306.

14. Notably, the ALJ did not mention the presence of tender points, the primary diagnostic technique for fibromyalgia.

15. Moreover, the ALJ's evaluation of the medical evidence understates the degree to which

ly yield normal results—a full range of motion, no joint swelling, as well as normal muscle strength and neurological reactions." *Id.* at 45 (quoting *Preston*, 854 F.2d at 818). Hence, the absence of swelling joints or other orthopedic and neurologic deficits "is no more indicative that the patient's fibromyalgia is not disabling than the absence of a headache is an indication that a patient's prostate cancer is not advanced." *Sarchet*, 78 F.3d at 307. Rather, these negative findings simply confirm a diagnosis of fibromyalgia by a process of exclusion, eliminating "other medical conditions which may manifest fibrositis-like symptoms of musculoskeletal pain, stiffness, and fatigue." *Preston*, 854 F.2d at 819.

Second, the ALJ noted that Green–Younger was only taking one medication for pain. But Dr. Helfand's records show that he reduced the number of pain medications, not because Green–Younger's pain lessened, but because the medications were ineffective in alleviating pain, necessitating alternative approaches. Moreover, it would seem that the strength, not the quantity, of painkillers is what matters. Finally, the absence of marked physical change between when Green–Younger was working and when she stopped is of little consequence given that she could not acceptably perform her job while employed and would not be welcomed back if she continued to exhibit her historical levels of absenteeism. As the magistrate judge noted, "in the six-year, ten-month period from July 20, 1988 until she stopped working on May 8, 1995, Green–Younger was out of work on disability leave for a period of at least four years."

### III.  Conclusion

After a full review of the record, we conclude that the ALJ's decision that Green–Younger is not legally disabled is

laboratory tests revealed the presence of phys-

based on an erroneous legal standard and is not supported by substantial evidence. When Dr. Helfand's opinions regarding Green–Younger's limitations are given controlling weight, it is clear that Green–Younger would not be able to perform her past work as a mail clerk. Dr. Blanks, the only vocational expert to testify before the ALJ, admitted that a person who could sit for only 30 minutes at a time and sit or stand for only four hours a day could not work as a mail clerk, or be otherwise employed in the national economy. Cf. *Harman*, 211 F.3d at 1180 (remanding for further proceedings because "there was no testimony from the vocational expert that the limitations found by the [treating physician] would render Appellant unable to engage in any work"). Accordingly, we reverse and remand to the district court with instructions to remand the matter to the Commissioner of the SSA for a calculation of disability benefits.