**Sharon L. ROSATO, Plaintiff,**

v.

**Jo Anne BARNHART, Commissioner of Social Security, Defendant.**

**No. 03 CV 5019(ADS).**

United States District Court, E.D. New York.

Jan. 22, 2005.

Binder and Binder, P.C., New York, NY (Charles E. Binder, of Counsel), for plaintiff.

Roslynn R. Mauskopf, United States Attorney Eastern District of New York, by Margaret Ann Donaghy, Special Assistant United States Attorney, Central Islip, NY, for the Defendant.

### MEMORANDUM OF DECISION AND ORDER

SPATT, District Judge.

Sharon L. Rosato ("Rosato" or the "plaintiff") commenced this action pursuant to the Social Security Act (the "Act"), 42 U.S.C. § 405(g), challenging the final determination of the Commissioner of Social Security (the "Commissioner") denying disability insurance benefits to her. Both

parties move for judgment on the pleadings pursuant to Rule 12(c) of the Federal Rules of Civil Procedure.

## I. BACKGROUND

### A. The Procedural History

On January 17, 2001, Rosato filed an application for social security disability insurance benefits, claiming disability since July 14, 2000 due to dizziness and tingling in her hands. After her application initially and on reconsideration was denied, she requested a hearing before an administrative law judge ("ALJ"). On August 20, 2002, a hearing was conducted before Administrative Law Judge Sy Rayner ("ALJ Raynor"). The plaintiff appeared with her attorney. In a decision dated September 18, 2002, ALJ Raynor found that Rosato was not disabled within the meaning of the Act and was therefore not entitled to disability insurance. On September 27, 2002, she filed a request for review with the Appeals Council. On January 3, 2003, the Appeals Council declined to review the claim. On August 8, 2003, the Appeals Council set aside the earlier action declining review to consider new evidence. In the same order, the Council denied the plaintiff's request for review, making the ALJ's decision the final administrative determination. On October 6, 2003, the plaintiff commenced the instant action challenging ALJ Raynor's decision.

### B. The Record

#### 1. The Plaintiff's Background and Testimony

Rosato was born on January 17, 1963, making her 39 years of age at the time of ALJ Raynor's decision. The plaintiff has a general education diploma ("GED"), and vocational training as a home health aid. She is married and has a teenage son. From August 1991 through September 1999, Rosato worked as a cashier and inventory analyst at a convenience store. From September 1999 to July 2000, she worked as a front desk clerk at an inn on a part-time basis. On July 14, 2000, the plaintiff allegedly sustained a disability due to dizziness and tingling in her hands.

At the hearing, Rosato testified that she suffers from dizzy spells, ringing in the ears, sharp pains in the head, and pains in her arms. She stated that she suffers everyday, but some days the symptoms are not as bad as other days. She claimed that the source of the dizzy spells is unknown, but that they are exacerbated by lights, sounds, and movements. Her dizzy spells occur when she is sitting and walking. She described having difficulty walking and stated that she falls if she walks too fast. When she walks, she has to hold on to walls in order to stay upright. Rosato stated that she can only walk about 300 feet, stand for about 15 minutes, and sit for about 30 minutes. At the time of the hearing, Rosato indicated that she was taking Nexium, Duratus, Durapel, Serevant, Metamucil, and Zyrtec.

Further, Rosato testified that she has difficulty with daily activities such as cooking, cleaning, showering, talking on the phone, and doing the laundry. The plaintiff stated that on bad days, she would burn and cut herself if she tried cooking a meal. She often spends nights on the couch because she cannot climb the stairs. She cannot read a newspaper or use a computer. She has difficulty talking on the phone, partly due to the fact that she has trouble completing sentences and remembering things. The plaintiff stated that she used to go to tupperware parties, but that she has problems with those activities now because crowds and sounds aggravate her condition. In addition, she gave up crocheting because it made her dizzy. The plaintiff also testified that she can no longer drive.

## 2. The Treating Physicians

### a. Dr. Richard Capello

Dr. Capello has been Rosato's primary care physician since January of 1993. Dr. Capello specializes in family medicine. On November 5, 2002, Dr. Capello submitted a narrative report regarding his treatment of the plaintiff since 1993. On July 28, 1998, Rosato first presented complaints of sudden onset of dizziness, light-headedness, and numbness in the left upper extremity. Dr. Capello referred Rosato to North Fork Radiology where she underwent a myriad of neurological tests. As a result of those tests, she was diagnosed as suffering from reproducible nystagmus— the involuntary back-and-forth or cyclical movements of the eyes—and vertigo due to a peripheral etiology, which was apparently triggered by light. *See Taber's Cyclopedic Dictionary* 1426 (19th ed.2001). She was treated with numerous libertory maneuvers, home balance exercises, and aggressive balance therapy.

In November 1998, Rosato developed right ear tinnitus, which is a subjective ringing, buzzing, tingling, or hissing sound in the ear, along with recurrent severe vertigo with head maneuvers. *See Taber's Cyclopedic Dictionary* 2104 (19th ed.2001). She also had severe pain and pressure in her ears along with myofascial pain. A CAT scan was negative. An ENT evaluation revealed findings of vertigo and tinnitus and the possibility of Meniere's disease. Rosato was given Meclizine and diuretics and she reported slight improvement.

In July 1999 Rosato had a reoccurrence of severe vertigo with nausea, vomiting, and visual difficulties. She was unable to drive or move her head. At this point she could no longer hold any gainful employment. She required numerous medications, such as, Pamelor, Claritin, nasal sprays, Meclizine, and PRN Compazine and balance therapy to control her symptoms.

In May 2002, Rosato complained that her symptoms had become worse. She was referred to numerous specialists to rule out MS, vasculitis, sarcoidosis, and connective tissue disease. An ENT diagnosed her with chronic relapsing disequilibrium syndrome.

On December 4, 2000, Rosato began noting a decrease in memory. She underwent another round of magnetic resonance imaging ("MRI") tests for the brain and cervical spine, which were negative. She also underwent a lumbar puncture of the spine, also known as a spinal tap, and a CSF analysis for MS, central nervous system for Lyme's, which also were negative.

Rosato's last visit before Dr. Capello's report was on November 16, 2002. Rosato was still experiencing unrelenting symptoms of dizziness, vertigo, nausea, inability to drive, exacerbation of the symptoms with head position changes, and her activities were restricted to basic activities of daily living with dependence on her husband. Based on his treatment and ENT tests, Dr. Cappello diagnosed her with a chronic relapsing disequilibrium and vestibular dysfunction of an unknown etiology. At the end of the report, Dr. Capello opined that Rosato was totally disabled for any type of occupation due to the persistence and progressive nature of the patient's balance dysfunction and complex symptoms.

### b. Dr. Norman Lee Pflaster

Dr. Pflaster, a neurologist, began treating Rosato in August 1998. The plaintiff's chief complaints at that time were light-headedness, vertigo, photophobia, phonophobia, and diminished response during dizzy spells. Dr. Pflaster performed numerous neurological tests and a musculoskeletal examination. Upon examination,

Dr. Pflaster noted that palpation of the left pronator teres, the muscle that flexes the forearm at the elbow, produced tingling in the left hand. Positive Tinel's and Phalen's signs were exhibited, bilaterally. Intermittent unsteadiness and bilateral weakness in the adductor pollicis brevis, the muscle that abducts and opposes the thumb, was observed with a casual gait. A sensory examination revealed bilateral diminished pinprick in median nerve distribution. A MRI, electroencephalogram ("EEG"), and electronystagmography ("ENG") were recommended.

In September 1998, Rosato reported that the symptoms had improved. An ENG revealed either a horizontal canal positional nystagmus or a central vestibular disorder. A vestibular disorder is a disorder of the middle part of the inner ear, behind the cochlea, and in from the semicircular canals. See Taber's Cyclopedic Dictionary 1426 (19th ed.2001). The EEG and MRI of the plaintiff's brain were normal. Dr. Pflaster observed jerky eye movements, an unsteady gait, and bilateral tenderness in the sternocleidomastoid, splenius capitis muscles, and petoralis muscles. Dr. Pflaster recommended pain management for the treatment of myofascial pain in the shoulder gridle muscles.

On October 23, 1998, Dr. Pflaster confirmed that the vertigo had worsened. The vertigo was only slightly responsive to the medication Meclizine. A liberatory maneuver was performed on the right ear and Rosato was instructed to keep her head elevated for 48 hours. Dr. Pflaster noted that the recent ENG revealed a nonlocalizing pattern of nystagmus. On November 25, 1998, Rosato presented complaints of right-sided headaches and tinnitus. Diagnostic tests revealed bilateral geotropic nystagmus of an unknown etiology. She was prescribed Nortiptyline and instructed to continue taking Claritin, Prilosec, and attending pain management.

On September 23, 1999, Dr. Pflaster stated that Rosato's use of Meclizine had worsened the symptoms of vertigo. On examination, Ms. Rosato exhibited bilateral upper trapezial pain, bilateral sternocleidomastoid tenderness, and exquisite right sternocleidomastoid tenderness. Another ENG revealed bilateral geotropic nystagmus. Dr. Pflaster diagnosed her as having vestibulopathy.

On August 3, 2000, Dr. Pflaster noted that Rosato had experienced difficulty swallowing and had swollen fingers. On examination, the presence of erythematous sclerae was observed, which is redness due to capillary dilation in the fibrous layer forming the outer envelope of the eyeball. See Stedman's Medical Dictionary 615, 1603 (27th ed.2000). An MRI of the cervical spine showed a small area of contrast enhancement in the mid-pons, part of the brainstem. A previous ENG had suggested a central abnormality. A follow-up visit on September 8, 2000, revealed an ENG with no abnormalities and that her condition had improved to the point where she wanted to go back to work.

On October 11, 2000, Dr. Pflaster wrote a letter to First Rehab Life Insurance describing Rosato's condition. He stated that she had suffered from chronic intermittent vertigo for the last two years. He also wrote that the etiology of the vertigo is unclear, but that it appears to be related to an abnormality of the brainstem. He indicated that she will most likely be disabled until at least November of 2000.

On December 6, 2000, Rosato presented continued complaints of vertigo and headaches, which worsened with eye closure. She experienced sharp right scalp pain, bilateral scalp sensitivity, and sharp pain in the parietal region. On examination, trace flattening of the right nasolabial fold was observed. She was diagnosed with rule-out central nervous system connective

tissue disease, rule-out central nervous system sarcoidosis (a sytemic disease involving internal lesions of unknown origin), rule-out hyperventilation syndrome, and rule-out psychogenic vertigo. Dr. Pflaster prescribed Klonopin.

Rosato next visited Dr. Pflaster on June 19, 2002. Dr. Pflaster reported that Rosato's thinking difficulties improved after she was prescribed vitamin B12. That same day, Dr. Pflaster completed a multiple impairment questionnaire for Rosato. Dr. Pflaster noted that he had been treating Rosato since August 21, 1998. His diagnosis was connective tissue disease, vertigo, and encephalopathy. Dr. Pflaster stated that clinical findings included a lesion revealed by an MRI, increased angiotensin-converting enzyme (ACE) in serum and central spinal fluid, low B12, and increased nuclear antigens (ANA). Rosato's symptoms were disequilibrium, and poor thinking. Dr. Pflaster also noted that the plaintiff was unable to look up and experienced tingling in her left hand, which worsened with use. Dr. Pflaster opined that she could sit for one hour a day, stand or walk for one hour a day, and lift or carry up to five pounds occasionally. Her medications included Guaifenesin, Nexium, Zyrtec, Serevent, and Metamucil.

Dr. Pflaster opined that Rosato's symptoms would frequently interfere with her attention and concentration, but that she was capable of tolerating moderate work stress. He was of the opinion that she would require frequent, long breaks during an eight-hour work day due to her pain, fatigue, and other symptoms. He believed that she needed to avoid noise, fumes, gases, temperature, extremes, humidity, dust, heights, pushing, pulling, kneeling, and bending. Dr. Pflaster's final diagnosis of Rosato's condition was connective tissue disease, vertigo, and encephalopathy, which is a disorder of the brain. *See Stedman's Medical Dictionary* 588 (27th ed.2000). Dr. Pflaster stated that her impairments would result in three or more absences from work each month.

**c. Dr. James Davis**

At the request of Dr. Capello, Rosato was referred to Dr. James Davis, a consulting neurologist. He examined her on or about September 28, 2000. Her complaints were mild confusion, lightheadedness, right ear pain, slurred speech, and hypersensitivity to noise. Rosato also noted that she would arrive at places without being aware of how she got there. She described her illness as attacks that lasted anywhere from days to months, and that there had been three to four such attacks in the last two years with intervals in which she is free of symptoms in between.

Neurologic examination revealed that Rosato was oriented to time, place, and person, with a decent recall of current events. There was diminished taste appreciation on the interior two-thirds of the tongue. Her hearing and all other cranial nerves were normal. Strength was full in all muscle groups of the arms and legs. She was able to walk normally and had no difficulty with touch, position, or vibration.

Dr. Davis performed a hyperventilation test. Rosato noted that the symptoms produced were the same she experienced during her attacks. Within twenty seconds she became lightheaded. Dr. Davis opined that because she was able to produce the symptomatology within 20 or 30 seconds, the most likely diagnosis was hyperventilation syndrome and part of an anxiety neurosis. He felt that as she had been extensively treated and her tests had been largely normal except for some subtle abnormalities, her condition could be related to earlier childhood traumas, such as falling down steps or when she had a syncopal episode. Dr. Davis noted that he did not give her a return appointment, but

would be happy to see her again if Dr. Capello or Rosato desired.

### d. Dr. Peter M. Rumore

Dr. Capello referred Rosato to Dr. Rumore, an examining Rheumatologist, for her complaints about vertigo. He examined her on September 12, 2000. She described her symptoms as sudden, causing a fainting sensation, which was intermittent and recurrent. Her episodes lasted weeks, interspersed by periods when she felt well. It was noted that she had extensive work up by neurologists and ENT's and it was believed that she had a central nervous system problem. On examination, Dr. Rumore noted several telangiectasias, or dilations of vessels, on the fingertips and one on the nose, but her skin was otherwise normal. Examination of her abdomen, muscle, joints, and spine were normal. Dr. Rumore stated that a review of her extensive laboratory studies over the previous two years revealed a low positive ANA, a positive single stranded DNA antibody, a mildly elevated angiotensin converting enzyme (ACE), and many normal parameters. Dr. Rumore's impression was that this was a complex case, for which several rheumatologic and immunological diagnoses needed to be considered. Dr. Rumore considered vasculitis, which is inflammation of the blood vessels, and sarcoidosis, which is a disease involving internal lesions of unknown cause, to be possible diagnoses.

On August 18, 2001, Rosato had a follow-up visit with Dr. Rumore. It was noted that pulmonary function tests had shown some mild obstructive airway disease and a possible subtle interstitial process, also known as fibrosis. A CAT scan from the spring of 2000 showed apical (the pointed extremity of a mark left in the skin) scarring but no hilar adenopathy, which is the swelling of the roots of the lungs along with a morbid change in lymph nodes, or other abnormal findings. *See Taber's Cyclopedic Dictionary* 143, 949 (19th ed.2001). He described her condition as a "complex" and "fascinating" dilemma of a young women with intermittent neurologic symptoms, pulmonary disease, arthralgias (inflamed joints), a positive ANA, one single low-positive anti-DNA, and ACE. He felt that she had an autoimmune process (the process of the body's cells attacking its own tissues), not classic lupus, but perhaps an atypical version as a possibility.

### 3. The Social Security Administration Consulting Physician Dr. Kautilya Puri

On March 20, 2001, at the request of the Social Security Administration, Rosato was examined by Dr. Kautilya Puri, a neurologist. Rosato told him that she has been experiencing dizzy spells for two and one-half years. She described the dizzy spells as a feeling of being woozy with an unbalanced feeling associated with pressure-type feeling in her head that can last the entire day. The symptoms would increase with light, but there were no factors that decreased the symptoms. She explained that the episodes would get better and then worse. Rosato reported that she drove to the clinic and was able to cook, clean, and do laundry.

Dr. Puri conducted an extensive physical examination that was largely normal. He observed that her gait and station were normal. Rosato's cranial nerves were normal and functional. The plaintiff's eyes were clear and fully reactive, with normal fundi. Her neck was supple with a normal range of motion. There was no sensory deficit. Rosato was able to hold a large object, pick up and manipulate a coin, write with a pen, button a button, open a can, and zip a zipper. Dr. Puri made reference to Rosato's extensive neurological and audiological examinations, but stated that the testing has not led to a diagno-

sis. Dr. Puri diagnosed Rosato as having episodic dizzy spells and gastroesophageal reflux disease. Dr. Puri's prognosis of Rosato was stable and he found no obvious limitations on the day of the neurological examination.

### 4. The Diagnostic Tests

The plaintiff received a cornucopia of diagnostic tests during the course of her treatment. On August 21, 1998, she underwent an EEG, which was normal, and an ENG that was abnormal due to the presence of bilateral geotrophic positional nystagmus with the eyes closed. On September 14, 1998, an MRI of the plaintiff's brain was negative and internal auditory canals were normal. On November 13, 1998, a CT scan of the plaintiff's sinuses showed clear sinuses with the nasal septum in the midline. On February 11, 2000, a CT scan of the neck was normal. On May 10, 2000, an MRA of the Circle of Willis, that is, the cerebral arterial circle, was normal. It was noted that her vertebral artery was much smaller on the left than the right, but it had normal direction flow. An MRA of the head and neck revealed unremarkable right common carotid, internal, external carotid, and right vertebral arteries. On August 3, 2000, an MRI of the cervical spine showed a small area of contrast enhancement in the mid-pons. On September 5, 2000, an ENT history indicated a normal ENT and neurological examination. An audiogram was negative and ENG testing was normal. On September 12, 2000, laboratory studies conducted over the previous two years revealed low positive ANA, positive single stranded DNA antibody, a mildly elevated angiotensin converting enzyme, and many normal parameters. Another ENG revealed bilateral geotropic nystagmus.

On December 27, 2000, an MRI of the brain revealed suspected cavernous angioma (a swelling or tumor due to proliferation) involving the pons, unchanged and of questionable significance. An MRI of the spine the same day revealed a normal cervical cord with no Chiaris malformations, no herniated nucleus pulposus, and normal marrow signal. On January 5, 2001, an MRI of the interior acoustic canal was normal. On June 19, 2002, Dr. Pflaster noted clinical findings that included a lesion on the MRI results, increased ACE in serum and central spinal fluid, increased ANA, and low vitamin B12.

### C. The ALJ's Findings

The ALJ denied Rosato's disability claim. Based on all the evidence, the ALJ opined that Rosato had a severe impairment consisting of a vestibular disorder. The ALJ further concluded that the minimal clinical findings and pathology revealed in the diagnostic testing did not demonstrate a debilitating condition. The ALJ found that the claimant did not have an impairment that meets the criteria of any impairment listed in 20 C.F.R. Part 404, Subpart P, Appendix 1. As such, the ALJ found that the plaintiff retained the residual capacity to perform light work as a receptionist and cashier.

In making this determination, the ALJ found the testimony of the plaintiff, regarding her conditions and inability to work, not fully credible. In support, the ALJ cited that despite a long history of complaints, Rosato reports frequent periods of improvement. The ALJ noted that Rosato walked slowly holding on to the wall and the backs of chairs as she entered the hearing room. However, the ALJ determined that her symptoms were not of such severity, persistency, and intensity as to preclude all work activity. The ALJ also found that the plaintiff's testimony was not supported by the medical evidence.

With regard to the medical evidence, the ALJ accorded little probative weight to the

opinion of Dr. Pflaster. The ALJ stated that Dr. Pflaster's opinion was that Rosato "was capable of less than sedentary work." The ALJ found that Dr. Pflaster's assessment of marginal physical capacities was unsupported by objective clinical findings and inconsistent with the minimal pathology demonstrated by MRI's of the internal auditory canal, Circle of Willis and cervical spine.

The ALJ afforded great weight to the opinion of Dr. Puri, the Social Security Administration review physician, that Rosato could perform light work. This opinion was based on his review of the medical record. The ALJ found that this opinion was consistent with the preponderance of the medical evidence, which consisted of minimal clinical findings. The ALJ also found that the consultative examiner and Dr. Davis concluded that no further appointment or treatment was required, and accorded these opinions considerable weight.

## II. *DISCUSSION*

### A. Standard of Review

A Court may set aside a determination by the Commissioner only if the decision was based on legal error or was not supported by substantial evidence in the administrative record. *See* 42 U.S.C. § 405(g); *Jasinski v. Barnhart,* 341 F.3d 182, 184 (2d Cir.2003); *Brown v. Apfel,* 174 F.3d 59, 61–62 (2d Cir.1999). Substantial evidence is "more than a mere scintilla." *Richardson v. Perales,* 402 U.S. 389, 401, 91 S.Ct. 1420, 28 L.Ed.2d 842 (1971) (citing *Consolidated Edison Co. v. NLRB,* 305 U.S. 197, 229, 59 S.Ct. 206, 83 L.Ed. 126 (1938)). Substantial evidence requires enough evidence that a reasonable person "might accept as adequate to support a conclusion." *Brown,* 174 F.3d at 62–63.

In determining whether the Commissioner's findings are supported by substantial evidence, the Court's task is "to examine the entire record, including contradictory evidence and evidence from which conflicting interferences can be drawn." *Id.* at 62 (quoting *Mongeur v. Heckler,* 722 F.2d 1033, 1038 (2d Cir.1983) (per curiam)). In addition, the Court is mindful that "it is up to the agency, and not this court, to weigh the conflicting evidence in the record." *Clark v. Commissioner of Soc. Sec.,* 143 F.3d 115, 118 (2d Cir.1998). Indeed, in evaluating the evidence, " 'the court may not substitute its own judgment for that of the Secretary, even if it might justifiably have reached a different result upon de novo review.' " *Jones v. Sullivan,* 949 F.2d 57, 59 (2d Cir.1991) (quoting *Valente v. Secretary of Health & Human Servs.,* 733 F.2d 1037, 1041 (2d Cir.1984)).

### B. Analytical Framework

Federal disability insurance benefits are available to those individuals who are "disabled" within the meaning of the Act. *See* 42 U.S.C. § 423(a), (d). To qualify for disability benefits under the Act, a plaintiff must establish her "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment ... which has lasted or can be expected to last for a continuous period of not less than 12 months." 42 U.S.C. § 423(d)(1)(A). The impairment must be of "such severity that he is not only unable to do his previous work but cannot, considering his age, education, and work experience, engage in any other kind of substantial gainful work which exists in the national economy." 42 U.S.C. § 423(d)(2)(A).

Federal regulations set forth a five-step analysis that the Commissioner must follow in evaluating disability claims:

1. **The ALJ must consider whether the claimant is currently engaged in substantial gainful activity.**

2. If not, the ALJ must consider whether the claimant has a "severe impairment" which limits her mental or physical ability to do basic work activities.

3. If the claimant has a "severe impairment," the ALJ must ask whether, based solely on medical evidence, that limitation is listed in Appendix 1 of the regulations.

4. If the impairment is not "listed" in the regulations, the ALJ then asks whether she has residual functional capacity to perform her past work despite her severe impairment.

5. If she is unable to perform her past work, the burden shifts to the ALJ to prove that the claimant retains the residual functional capacity to perform alternative work.

20 C.F.R. §§ 404.1520, 416.920; *Butts v. Barnhart*, 388 F.3d 377, 383 (2d Cir.2004); *Green–Younger v. Barnhart*, 335 F.3d 99, 106 (2d Cir.2003) (citing *Draegert v. Barnhart*, 311 F.3d 468, 472 (2d Cir.2002)). The claimant bears the burden of proof as to the first four steps, while the ALJ bears the burden of proof as to the fifth step. *See Shaw v. Chater*, 221 F.3d 126, 132 (2d Cir.2000). In proceeding through the five-step analysis, the Commissioner must consider four factors: "(1) objective medical facts, (2) diagnosis or medical opinions based on these facts; (3) subjective evidence of pain and disability; and (4) the claimant's educational background, age, and work experience." *Mongeur v. Heckler*, 722 F.2d 1033, 1037 (2d Cir.1983).

**C. Analysis**

**1. The Treating Physician Rule**

■ The ALJ is required to accord special evidentiary weight to the opinion of the treating physician, as long as the treating physician's opinion is supported by medically acceptable techniques, results from frequent examinations, and the administrative record. *See Clark v. Commissioner of Soc. Sec.*, 143 F.3d 115, 119 (2d Cir.1998). The "treating physician rule," as it is known, "mandates that the medical opinion of the claimant's treating physician [be] given controlling weight if it is well supported by the medical findings and not inconsistent with other substantial record evidence." *Shaw v. Chater*, 221 F.3d 126, 134 (2d Cir.2000); *see also Rosa v. Callahan*, 168 F.3d 72, 79 (2d Cir.1999); *Clark*, 143 F.3d at 119; *Schisler v. Sullivan*, 3 F.3d 563, 567 (2d Cir.1993).

If the opinion of the treating physician as to the nature and severity of the impairment is not "well-supported" by objective evidence, the obligation to give controlling weight to a treating physician's opinion is inapplicable. *Schisler v. Sullivan*, 3 F.3d 563, 567 (2d Cir.1993). When controlling weight is not given to a treating physician's medical opinion, the ALJ must consider various "factors" to determine how much weight to give the opinion, such as: (1) the length of the treatment relationship and frequency of the examination; (2) the nature and extent of the treatment relationship; (3) the extent to which the opinion is supported by medical and laboratory findings; (4) the physician's consistency with the record as a whole; and (5) whether the physician is a specialist. 20 C.F.R. §§ 404.1527(d)(2), 416.927(d)(2); *Halloran v. Barnhart*, 362 F.3d 28, 32 (2d Cir.2004). Furthermore, the ALJ must provide "good reasons" for not crediting the opinion of a plaintiff's treating physician. *See* 20 C.F.R. § 416.927(d)(2); *Snell v. Apfel*, 177 F.3d 128, 133 (2d Cir.1999) (citing *Schaal v. Apfel*, 134 F.3d 496, 505 (2d Cir.1998)).

■ Here, the ALJ identified only Dr. Pflaster as the plaintiff's treating physician. In so doing, the ALJ totally failed to acknowledge Dr. Capello's treatment of

the plaintiff. Dr. Capello had treated Rosato since 1993, was the first physician to diagnose Rosato with vertigo in 1998, referred her to specialists, received continual reports from Rosato's other treating physicians, and was treating the plaintiff at the time of the hearing in 2002, a period of nine years. After many years of examinations, Dr. Capello consistently reported that the plaintiff complained of intense episodes of vertigo. Moreover, Dr. Capello submitted a detailed letter summarizing his treatment of Rosato and concluded that the plaintiff was totally disabled. The ALJ failed to indicate what weight, if any, that he accorded to these aspects of Dr. Capello's opinion. *See Schisler v. Sullivan,* 3 F.3d 563, 567 (2d Cir.1993) (holding that the ALJ is required to articulate the weight that is given to treating doctor's conclusions). The ALJ also failed to provide any reason as to why controlling weight was not given to Dr. Capello's conclusion that the plaintiff was totally disabled.

In addition to failing to acknowledge the opinions and conclusion of Dr. Capello, the ALJ also failed to acknowledge Dr. Rumore, the plaintiff's examining Rheumatologist. Dr. Rumore described Rosato as a "complex" and fascinating case. Dr. Rumore diagnosed Rosato with intermittent neurological symptoms and possibly and auto-immune disorder. This diagnosis conforms with the reports of Dr. Capello and Dr. Pflaster.

In declining to give controlling weight to the opinion of Dr. Pflaster, the ALJ stated that the opinion was inconsistent with the pathology and unsupported by the objective clinical findings. In the Court's view, "The ALJ effectively required 'objective' evidence for a disease that eludes such measurement." *Green–Younger v. Barnhart,* 335 F.3d 99, 108 (2d Cir.2003). Generally, " 'objective' findings are not required in order to find that an applicant is disabled." *Id.* (citing *Donato v. Sec. of Dep't of Health and Human Servs.,* 721 F.2d 414, 418–19 (2d Cir.1983)) ("Subjective pain may serve as the basis for establishing disability, even if ... unaccompanied by positive clinical findings of other 'objective' medical evidence"); *see also Cruz v. Sullivan,* 912 F.2d 8, 12 (2d Cir. 1990); *Eiden v. Secretary of Health, Educ., and Welfare,* 616 F.2d 63, 65 (2d Cir.1980); *Cutler v. Weinberger,* 516 F.2d 1282, 1286–87 (2d Cir.1975); *Cline v. Sullivan,* 939 F.2d 560, 566 (8th Cir.1991).

The record reveals that Dr. Pflaster and Dr. Capello based their conclusions on specific findings. The working neurological ENT diagnosis was a chronic relapsing disequilibrium and vestibular dysfunction of essentially unknown etiology. In making their diagnosis that the plaintiff was totally disabled, the doctors relied on Rosato's long-standing and persistent complaints of unrelenting dizziness, vertigo, nausea, and inability to drive. The Second Circuit has stated that "a patient's report of complaints, or history, is an essential diagnostic tool." *Green–Younger,* 335 F.3d at 107 (quoting *Flanery v. Chater,* 112 F.3d 346, 350 (8th Cir.1997)).

The ALJ also accorded great weight to the opinions of Dr. Davis and Dr. Puri, the consulting Social Security physician. In particular, the ALJ noted that Dr. Davis "conclu[ded] that no further work up or treatment was required." However, an examination of the record reveals that Dr. Davis simply wrote to her treating physician and stated that "he would be happy to see her at anytime you or she desires, but I did not give her a return appointment." Moreover, the Court finds that Dr. Davis' findings do not contradict the diagnosis of the plaintiff's treating physicians. Dr. Davis opined that Rosato was suffering from hyperventilation syndrome. Although the diagnosis was different, Dr.

Davis confirmed that the plaintiff was suffering from the same vertigo symptoms noted by her treating physicians. Thus, the Court factually disagrees with the ALJ's assessment that Dr. Davis report was inconsistent with the reports of Rosato's treating physicians.

Of all the doctors that treated the plaintiff, Dr. Puri, the Social Security consultant, was the only physician that opined that the plaintiff had no symptoms. The ALJ accorded this one-time examination that primarily consisted of physical tests, "great weight," and summarily accorded no weight to the opinions of treating physicians, including a neurological specialist who had been treating the plaintiff over the course of several years. Accordingly, the Court concludes that the ALJ's finding that Rosato could perform light work activities was not supported by substantial evidence.

### 2. The Plaintiff's Credibility

In finding that Rosato could engage in light work activities, the ALJ discredited Rosato's testimony including her subjective complaints. It is true that "[i]f the Secretaries findings are supported by substantial evidence ... the court must uphold the ALJ's decision to discount the claimant's subjective complaints of pain." *Aponte v. Secretary of Health and Human Services*, 728 F.2d 588, 591 (2d Cir.1984). Nevertheless, the Court has found, as noted above, that the ALJ's findings were not supported by substantial evidence, but was partly supported by mischaracterization or misunderstanding of the record and material omission of her treating physician's opinion.

Although the ALJ found that Rosato had a long history of complaints of dizziness, and noted that she needed to hold onto the backs of chairs while entering the hearing room, the ALJ found her testimony not credible. Specifically, the ALJ noted that her testimony was not well-supported by the medical evidence and that she reported frequent periods of improvement. In support of the finding that the plaintiff reported frequent periods of improvement, the ALJ cites to one report dated December 6, 2000, in which the doctor described the intermittent nature of her disability.

The Court finds that the ALJ's basis for discrediting the plaintiff's testimony is insufficient and belied by the record. As stated above, the overwhelming medical evidence supports the plaintiff's complaints of a severe condition of vertigo. The Court notes that her condition required a series of tests including a rare and serious lumbar puncture. In addition, it appears that the ALJ misunderstood the nature of Rosato's complaints. It is clear from the record that an integral part of her alleged disability involves the unpredictable and intermittent nature of her attacks. Therefore, the ALJ erred in discrediting the plaintiff's testimony partly based on Rosato's "frequent periods of improvement." In the Court's view, the ALJ failed to support his lack of credibility finding with sufficient analysis or specificity. This is especially so given the fact that the medical evidence supporting his position was minimal and the two treating physicians were of the unequivocal opinion that the plaintiff was totally disabled.

### C. Disposition

After reviewing the Commissioner's determination, a reviewing court may "enter, upon the pleadings and transcript of the record, a judgment affirming, modifying, or reversing the decision of the Commissioner of Social Security, with or without remanding the cause for a rehearing." 42 U.S.C. § 405(g) (2004). In determining whether to remand, a key factor is whether the administrative record contains

gaps so that further development of the evidence is appropriate. *Butts v. Barnhart,* 388 F.3d 377, 385 (2d Cir.2004). Remand is inappropriate if the court has no reason to believe a more complete record might support the Commissioner's decision. *Id.* In such case, remand solely for calculation of benefits is appropriate. *Id.*

Here, the Commissioner failed to properly evaluate the plaintiff's subjective complaints of vertigo and failed to consider the weight to accord the treating physicians. The ALJ concluded that because the plaintiff's alleged symptomatology and subjective restrictions stemming therefrom are largely unsubstantiated by the medical evidence, such symtomatology cannot be characterized as debilitating. However, before rejecting the testimony of any witness, "a finding that the witness is not credible must nevertheless be set forth with sufficient specificity to permit intelligible plenary review of the record." *Williams ex rel. Williams v. Bowen,* 859 F.2d 255, 260–61 (2d Cir.1988) (citation omitted).

Not only do the treating physician's reports completely refute this conclusion, but the ALJ failed to set forth his rationale "with sufficient specificity to enable [this Court] to decide whether [this] determination is supported by substantial evidence." *Ferraris v. Heckler,* 728 F.2d 582, 587 (2d Cir.1984). The ALJ accorded great weight to the consulting physician's one time examination of the plaintiff, which primarily consisted of physical tests, rather than neurological tests. At the same time, the ALJ apparently totally ignored the opinion of the treating physician, Dr. Capello. Upon remand, the ALJ shall set forth his finding with particularity on these issues so that the Court may adequately review the record.

In addition, the ALJ never reached the issue of whether there is other work in the national economy that Rosato could perform because the ALJ found that Rosato was able to perform her prior work. Thus, upon remand, the ALJ and the Commissioner should determine whether Rosato can perform other work in the national economy.

### III. CONCLUSION

Based on the foregoing, it is hereby

**ORDERED,** that the Commissioner's motion for judgment on the pleadings is **DENIED;** and it is further

**ORDERED,** that Rosato's motion for judgment on the pleadings is **GRANTED** to the extent set forth in this decision and order; and it is further

**ORDERED,** that the final decision of the Commissioner is vacated and this case is remanded to the Commissioner pursuant to the fifth sentence of 42 U.S.C. § 405(g), for further administrative proceedings in accordance with this order; and it is further

**ORDERED,** that the Clerk of the Court is directed to close this case.

**SO ORDERED**