**FILED**
**United States Court of Appeals**
**Tenth Circuit**

**October 18, 2007**

**Elisabeth A. Shumaker**
**Clerk of Court**

**UNITED STATES COURT OF APPEALS**

**FOR THE TENTH CIRCUIT**

---

CRYSTAL M. GIVENS,

        Plaintiff-Appellant,

v.

MICHAEL J. ASTRUE,
Commissioner, Social Security
Administration,

        Defendant-Appellee.

No. 07-5021
(D.C. No. 05-CV-612-M)
(N.D. Okla.)

---

**ORDER AND JUDGMENT**[*]

---

Before **HOLMES**, **HOLLOWAY**, and **SEYMOUR**, Circuit Judges.

---

Crystal M. Givens appeals from an order of the district court affirming the

Commissioner's decision denying her application for Supplemental Security

Income benefits (SSI).  Ms. Givens filed for these benefits on September 29,

2003.  She alleged disability based on knee surgeries, back pain, carpal tunnel

---

[*]    After examining the briefs and appellate record, this panel has determined unanimously to grant the parties' request for a decision on the briefs without oral argument.  *See* Fed. R. App. P. 34(f); 10th Cir. R. 34.1(G).  The case is therefore ordered submitted without oral argument.  This order and judgment is not binding precedent, except under the doctrines of law of the case, res judicata, and collateral estoppel.  It may be cited, however, for its persuasive value consistent with Fed. R. App. P. 32.1 and 10th Cir. R. 32.1.

syndrome, anxiety, and depression. The agency denied her applications initially and on reconsideration. We reverse and remand for further consideration.

On April 26, 2005, Ms. Givens received a de novo hearing before an administrative law judge (ALJ). The ALJ determined that Ms. Givens retained the residual functional capacity (RFC) to perform sedentary work, restricted by: her inability to use her lower extremities for repetitive movements such as operating foot pedals; her inability to climb stairs or ladders; and her need to avoid unprotected heights, moving machinery, driving, and vibrations. He found that she could not return to her past relevant work but that there were a significant number of other jobs which she could perform in the national or regional economy. Applying the Medical-Vocational Guidelines, 20 C.F.R. Pt. 404, Subpt. P, App. 2, rule 201.24 (the grids) as a framework, the ALJ concluded that Ms. Givens was not disabled within the meaning of the Social Security Act. When the Appeals Council denied review, the ALJ's decision became the final decision of the Commissioner.

We review the Commissioner's decision to determine whether the factual findings are supported by substantial evidence in the record and whether the correct legal standards were applied. *Andrade v. Sec'y of Health & Human Servs.*, 985 F.2d 1045, 1047 (10th Cir. 1993). Substantial evidence is "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Fowler v. Bowen*, 876 F.2d 1451, 1453 (10th Cir. 1989) (quotations omitted).

The Commissioner follows a five-step sequential evaluation process to determine whether a claimant is disabled. *See Williams v. Bowen*, 844 F.2d 748, 750-52 (10th Cir. 1988). The claimant bears the burden of establishing a prima facie case of disability at steps one through four. *See id.* at 751 n.2. If the claimant successfully meets this burden, the burden shifts to the Commissioner at step five to show that the claimant retains a sufficient RFC to perform work in the national economy, given her age, education and work experience. *See id.* at 751. This case was decided at step five of the sequential analysis.

In this appeal, Ms. Givens contends that the ALJ failed to perform a proper step five evaluation. She advances several alleged deficiencies in his analysis, mostly concerned with his evaluation of her alleged mental impairments. Specifically, she contests his failure to consider (1) the effect of her Global Assessment of Function Score (GAF) on her ability to work; (2) the effect of her somatoform disorder; (3) the Psychiatric Review Technique form (PRT) completed by the agency's reviewing experts; and (4) the effect of her carpal tunnel syndrome.

**1. Mental Impairments**

We find it useful to consider Ms. Given's challenges to the evaluation of her mental impairments as a unit. In the aggregate, the deficiency of the ALJ's analysis becomes starkly evident.

## A. Medical Evidence

At a young age, Ms. Givens suffered from a number of severely traumatic experiences that contributed to her history of anxiety and depression. She testified at the ALJ hearing that, at the age of seven or eight, she was raped by one of her mother's friends. At thirteen she was raped again, by a friend of her boyfriend. In her adult life, she has a longstanding history of abusive relationships with men.

The first medical record concerning treatment for depression present in the administrative record is dated May 12, 2004, from Dr. Collier. He assessed Ms. Givens with "moderately depressed mood," Aplt. App., Vol. III, at 252, and prescribed Elivil for depression. The Elivil was later changed to Wellbutrin.

On June 14, 2004, an outpatient treatment plan was completed for Ms. Givens at FC&S Mental Health Care. It was noted that in 1994, she was treated for depression for about one year, at which time she was prescribed first Prozac and then Zoloft. Her 2004 diagnoses were 1) Major Depression, Severe, with Psychotic Features; 2) Post-Traumatic Stress Disorder (PTSD); and 3) Attention Deficit Hyperactivity Disorder (ADHD), Inattentive Type. *Id.* at 203. The report assigned her a GAF score of 50, and indicated that her highest GAF score in the past year was also 50.[1]

---

[1]     "The GAF is a subjective determination based on a scale of 100 to 1 of 'the

(continued...)

-4-

The treatment plan noted that Ms. Givens "reports seeing shadowy figures and shapes and hearing voices at night." *Id.* at 204. She was "anxious and nervous over how others treat her," was "[e]asily distracted, unable to focus on tasks, easily bored and irritated." *Id.* She reported that she was "nervous and emotional[ly] [labile] and easily angered by everybody and everything." *Id.* at 205. It was noted that she was chronically tired, unable to keep up with her house work, failed to maintain personal hygiene on a daily basis, and "ends up in her room and lets the kids fend for themselves." *Id.*

A physician with FC&S noted on July 28, 2004, that Ms. Givens had suffered from suicidal ideation but had made no attempts to kill herself. She sometimes sensed the presence of her deceased grandmother. *Id.* at 200. While this doctor did not see evidence of psychosis, she noted "social isolation" as a diagnosis and also assigned Ms. Givens a GAF score of 50. *Id.* at 201.

On November 4, 2004, a documentation form from FC&S noted that Ms. Givens' progress in psychotherapy was "slow." *Id.* at 303. An outpatient treatment plan completed at around the same time diagnosed her with (1) Major

[1](...continued)
clinician's judgment of the individual's overall level of functioning.' AMERICAN PSYCHIATRIC ASSOCIATION, DIAGNOSTIC AND STATISTICAL MANUAL OF MENTAL DISORDERS (Text Revision 4th ed. 2000) [DSM-IV-TR] at 32. . . . A GAF score of 41-50 indicates '[s]erious symptoms . . . [or] serious impairment in social, occupational, or school functioning,' such as inability to keep a job. *Id.* [at 34]." *Langley v. Barnhart*, 373 F.3d 1116, 1123 n.3 (10th Cir. 2004).

Depression Recurrent with Psychotic Features and (2) Cannabis Abuse. It noted that she had "decompensated over the past 4 weeks in feelings and self-care and thinking ability." *Id.* at 308. Ms. Givens appeared disheveled at times and was "sad and worried most of each day," *id.* at 310.

### B. Hearing Testimony

Ms. Givens' mood fluctuated over the next few months, mostly in connection with difficulties with her boyfriend. At the hearing before the ALJ, she reported difficulty sleeping, with nightmares and dreams about her grandmother. She had difficulties leaving her house because she sought to avoid interaction with others and had difficulties controlling her anger. She also stated that she heard voices. When asked what the voices told her, she said they told her to kill her boyfriend. She also heard the voices when she went grocery shopping. She tried to ignore them so that she would not "get in trouble." *Id.* at 397.

At the hearing, Ms. Givens' attorney asked the vocational expert (VE) whether a person with a GAF score of 50 would be able to maintain employment. She replied:

> Generally, they would not. They would be able to work for short periods of time, but that [GAF score] puts them in a serious range of sustaining work-like activities over long periods, even some problems with the activities of daily living on a sustained basis.

*Id.* at 404.

### C. Agency PRT Form

In addition to the medical records, Ms. Givens' testimony, and the VE's opinion, the record contains a Psychiatric Review Technique (PRT) form completed January 2, 2004 (prior to the aforementioned medical records) by Dr. Pearce, a non-examining agency psychologist. Dr. Pearce concluded that Ms. Givens suffered from an "Adjustment disorder [with] depressed mood," *id.* at 179, and an "Adjustment disorder [with] anxious mood," *id.* at 181, but that these disorders did not represent severe impairments. He assigned her only "mild" limitations in the categories of "Restriction of Activities of Daily Living"; "Difficulties in Maintaining Social Functioning"; and "Difficulties in Maintaining Concentration, Persistence, or Pace." *Id.* at 186. He concluded that there was insufficient evidence of "Episodes of Decompensation, Each of Extended Duration." *Id.*

Dr. Pearce gave several reasons for his conclusion that Ms. Givens' mental impairments were not severe.[2] None of these reasons finds support in the evidence. First, he noted that although Ms. Givens stated in her application for benefits that she was taking Zoloft, an anti-depressant, she also indicated that she had not seen anyone for medical health treatment. *Id.* at 188. Ms. Givens'

---

[2] The statement of reasons, contained in the portion of the form reserved for "consultant's notes," may have been completed by the physician who reviewed Dr. Pearce's work, Dr. Varghese. Aplt. App., Vol. III, at 188.

application for SSI benefits is a mechanically-produced form that contains no reference to medical treatment. *Id.*, Vol. II, at 83-85. We presume Dr. Pearce was referring to her "Disability Report – Adult." The "Disability Report – Adult" is undated but must have been completed sometime between September 24 and October 3, 2003, *id.* at 98, i.e., prior to Dr. Pearce's determination. This form does refer to her Zoloft prescription, *see id.* at 99, but it also notes that Ms. Givens was seeing a Dr. Stairs "for Depression and Anxi[et]y" and that she had an upcoming appointment with him, *id.* at 98. Given this reference to treatment, the record does not support Dr. Pearce's conclusion that Ms. Givens denied receiving current mental health treatment.

Dr. Pearce further stated that Ms. Givens' current treating physician did not indicate that she was taking any medications for depression. *Id.*, Vol. III, at 188. It is unclear what record he relied on to make this conclusion. While it is true the medical records from Family Medicine Associates, Ms. Givens' treating physicians just prior to Dr. Pearce's completion of the PRT form, do not mention her Zoloft prescription, they also do not contain any comprehensive summary of her current medications. *Id.* at 288-91. The absence of a reference to Zoloft thus appears inconclusive at best.

Dr. Pearce also relied on a reference in a medical record dated October 24, 2003, that Ms. Givens appeared "alert and oriented." *Id.* at 188. The referenced record was generated for discharge purposes after Ms. Givens' surgery under

-8-

general anesthesia. A nurse checking these two boxes after the surgery on a form that also advised Ms. Givens not to drive, operate machinery of any kind, or sign legal documents for 24 hours, and warned her of intermittent dizziness, *id.* at 151, can hardly be viewed as a professional medical opinion regarding her mental status generally.

Finally, Dr. Pearce noted "[n]o mental allegations indicated by [Ms. Givens' treating physicians]." *Id.* at 188. This conclusion appears to have been reached without any reference to treatment records from Dr. Stairs, which are not contained in the record although they are referred to by Ms. Givens in her disability report.

### D. ALJ's Decision

In his decision, the ALJ described the FC&S evaluations of June 14, 2004, and November 2, 2004, but did not identify the weight he gave to them or provide any reasons for rejecting their conclusions. He then listed depression as one of Ms. Givens' severe impairments. *Id.*, Vol. II, at 51. Apparently relying on the PRT form completed by Dr. Pearce, but without explicit reference to it, he concluded that she did not meet the full requirements of a Step Three listing for a mental impairment. *Id.* at 51-52.[3] Interestingly, in spite of the November 4, 2004

_____

[3] The ALJ's evaluation of the mental functional limitation categories differs from that of Dr. Pearce in one respect: the ALJ found "no" limitation with respect to social functioning, while Dr. Pearce found a "mild" restriction in this

(continued...)

record reference to Ms. Givens' decompensation over a period of four weeks, the ALJ's decision tracked Dr. Pearce's earlier PRT form in finding "[t]here is no evidence in the record of deterioration or decompensation because of her mental impairments." *Id.* at 52. Dr. Pearce's form was, of course, also prepared before the FC&S records concerning her mental health were generated.

This was the last reference to a mental impairment in the ALJ's decision. His RFC determination contained no reference to mental limitations of any kind. *Id.* at 53.

### E. Analysis

We discern multiple significant errors in the ALJ's evaluation of Ms. Givens' mental impairments and, hence, in his conclusions regarding her RFC and her ability to perform the jobs he identified at step five of the analysis. Of primary concern, the ALJ concluded at step two of the analysis that Ms. Givens' depression constituted a severe impairment. That impairment had disappeared from his analysis, however, by the time he reached step five. This adjudicative sleight-of-hand was not achieved in conformity with either the applicable regulations or the evidence. A discussion of the ALJ's errors throughout his analysis is helpful in understanding his missteps at step five.

---

[3](...continued)
area. *Compare* Aplt. App., Vol. II, at 52 *with id.*, Vol. III, at 186.

"[A]n ALJ is required to consider all of the claimant's medically determinable impairments, singly and in combination; the statute and regulations require nothing less" and a failure to do so "is reversible error." *Salazar v. Barnhart*, 468 F.3d 615, 621 (10th Cir. 2006). In the case of mental impairments, the ALJ must determine the severity of an applicant's mental impairments using the procedures described (for SSI purposes) in 20 C.F.R. § 416.920a. These procedures require him to rate the degree of functional limitation attributable to the alleged impairment. § 416.920a(c). Here, the ALJ found that Ms. Givens had only

> mild limitation with respect to "activities of daily living," [had] no limitation with respect to social functioning, and [had] mild limitation with respect to concentration[,] persistence, and pace. There is no evidence in the record of deterioration or decompensation because of her mental impairments.

Aplt. App., Vol. II, at 52.

Notwithstanding these conclusions about the "mild" nature of the functional limitations caused by Ms. Givens' depression, the ALJ nevertheless concluded at step two that depression was a "severe" impairment. Aplt. App., Vol. II, at 51. This creates an odd inconsistency in his decision. But in fact, the ALJ's conclusion that Ms. Givens had only mild or no significant limitations due to mental impairments finds little support in the record. His decision gives no specific reasons, with reference to the evidence, for his conclusions. The only medical opinion that provides specific support for his conclusions appears to be

Dr. Pearce's PRT form. For the reasons we have discussed, the medical evidence does not support the statement of reasons contained on the PRT form. *See Washington v. Shalala*, 37 F.3d 1437, 1442 (10th Cir. 1994) ("There must be competent evidence in the record to support the conclusions recorded on the PRT form and the ALJ must discuss in his opinion the evidence he considered" in reaching his conclusions regarding claimant's mental limitations) (citation omitted). Moreover, the evidence flatly contradicts the ALJ's statement that there is no evidence in the record of decompensation due to mental impairments. *See* Aplt. App., Vol. III, at 308.

As we have detailed above, the record contains much evidence indicating that Ms. Givens' mental impairments are anything but mild. Psychotic depression, for example, would seem to have at least some impact on one's ability to work. The ALJ gave only cursory consideration to this evidence in his decision, and supplied no reasons for rejecting it. An ALJ "may not ignore evidence that does not support his decision, especially when that evidence is significantly probative." *Briggs ex rel. Briggs v. Massanari*, 248 F.3d 1235, 1239 (10th Cir. 2001) (quotation omitted); *see also Clifton v. Chater*, 79 F.3d 1007, 1010 (10th Cir. 1996) ("[I]n addition to discussing the evidence supporting his decision, the ALJ also must discuss . . . significantly probative evidence he rejects.").

In particular, Ms. Givens' treating physician assigned her a GAF score of 50. The ALJ gave no reason for rejecting this assessment.[4] The VE stated at the hearing that a person with a GAF score of 50 would have difficulty maintaining employment. Nowhere in his decision did the ALJ consider the effect of this difficulty on Ms. Given's ability to work. Nor did he analyze the GAF score as the opinion of a treating physician as required by the regulations and our case law. *See, e.g., Watkins v. Barnhart*, 350 F.3d 1297, 1300 (10th Cir. 2003).

A further error occurred when, having found Ms. Givens' depression "severe" at step two – a determination virtually compelled by the evidence – the ALJ failed to consider or include any mental limitation in his RFC analysis. *See Hargis v. Sullivan*, 945 F.2d 1482, 1488 (10th Cir. 1991) ("[O]nce a mental impairment is considered to be severe, it must be included in the residual functional capacity assessment. . . ."); 20 C.F.R. § 416.920a(d)(3). While paying lip service to this principle in his decision, *see* Aplt. App., Vol. I at 50, the ALJ halted his evaluation of Ms. Givens' mental impairments at step three, *id.* at 52-54.

---

[4]    In his brief, the Commissioner argues that a low GAF score "may indicate problems that do not necessarily relate to the ability to hold a job." Aplee. Br. at 21. Even assuming this is true, the ALJ's decision does not indicate he reached the conclusion that Ms. Givens' low GAF score was due to non-occupationally-related factors.

The ALJ's hypothetical question to the VE, while indicating that Ms. Givens would be "afflicted with symptoms from various sources" did not identify any specific symptoms other than those resulting from pain. *Id.*, Vol. III, at 399. It is therefore unknown whether the VE would have concluded that Ms. Givens' mental symptoms, as described by her physicians, left her incapable of doing the jobs he identified. We do know the VE was convinced that if her hearing testimony, which among other things discussed sleep deprivation and hearing voices, were true, she would not be able to perform any occupation. *Id.* at 401-02.

In sum, this case must be remanded to the agency for a proper evaluation of Ms. Givens' ability to work that includes her mental impairments, in accordance with the statutory and regulatory criteria. The mental impairments should be evaluated at each level in the administrative review process by following the "special technique" set forth in the regulations. 20 C.F.R. § 416.920a(a). Any conclusions reached on a PRT form should be supported by competent evidence in the record. If the ALJ rejects any significantly probative medical evidence concerning Ms. Givens' RFC, he must provide adequate reasons for his decision to reject that evidence. His hypothetical questions to the VE should adequately reflect the effect of any mental impairments he finds, and his conclusions on the effect of such impairments on her ability to work should be supported by substantial evidence.

-14-

## 2. Somatoform Disorder

Ms. Givens argues that the ALJ ignored the existence of her "somatoform disorder." She points to a single reference in the agency PRT form, on which Dr. Pearce noted a "chronic pain syndrome." Aplt. App., Vol. III, at 188. She contends that "chronic pain syndrome" is a form of somatoform disorder and should not have been ignored by the ALJ. Aplt. Br. at 26. This passing reference, however, unsupported by any objective medical evidence, did not require further investigation or development of the record by the ALJ. *See Hawkins v. Chater*, 113 F.3d 1162, 1167 (10th Cir. 1997) (stating that ALJ's duty to develop the record concerning condition requires "the presence of some objective evidence in the record suggesting the existence of [that] condition.").

## 3. Carpal Tunnel Syndrome

Finally, Ms. Givens contends the ALJ improperly rejected her claim that she suffers from carpal tunnel syndrome. In his decision, he stated that her complaint of carpal tunnel syndrome was "unsupported by the objective medical evidence." Aplt. App., Vol. II, at 52. She asserts that there is objective medical evidence to support the diagnosis and that the ALJ should therefore have listed it as a "severe" impairment at step two and considered its effect on her ability to work at step five.

The medical record contains several references to carpal tunnel syndrome, including specific diagnoses of that condition. Aplt. App., Vol. III, at 259, 265,

277, 279, 283. On January 14, 2004 and March 16, 2004, it was noted that testing revealed a positive Tinel's sign, *id.* at 263, 264, 283, which is indicative of the syndrome, *see Green-Younger v. Barnhart*, 335 F.3d 99, 103 (2d Cir. 2003). The ALJ's conclusion that there was no objective medical evidence of carpal tunnel syndrome is unsupported by the record. On remand, he should properly evaluate the effect, if any, of Ms. Givens' alleged impairment of carpal tunnel syndrome on her ability to perform work-related activities.

The judgment of the district court is REVERSED and the case is REMANDED to the district court, with instructions to remand to the Commissioner for further proceedings in accordance with this order and judgment.

Entered for the Court


Stephanie K. Seymour
Circuit Judge